## Louis C. Iauch

*v.*

## Pauline de Socarras and Rudolfo de Socarras, Jr., an infant, by his guardian.

[Filed October 17th, 1898.]

1. In a suit to set aside a conveyance of real estate as in fraud of creditors, the fact that, though the debt sued on was an honest one, complainant had not expended money or altered his situation on the strength of defendant having any ownership in the property, is not of itself sufficient to defeat complainant's right to relief.

2. A written declaration of trust, made a long time after the title had vested, but in good faith, and in strict accordance with the parol trust made at the time the title did vest, is valid as against a creditor of declarant.

3. Nor is the validity of such trust affected by the fact that declarant was pressed by creditors at the time it was created.

Heard on bill, the joint answer of the two defendants, the cross-bill of Pauline de Socarras, and the replication of the complainant thereto.

*Messrs. Heisley & Morris,* for the complainant.

*Mr. Thomas P. McKenna* and *Mr. Frank P. McDermott,* for the defendants.

PITNEY, V. C.

The bill is filed by a judgment creditor of Pauline de Socarras, and its object is to set aside a settlement made by her in favor of her son, Rudolfo de Socarras, Jr., the other defendant, of certain real estate, a house and lot in Long Branch, in Monmouth county, and subject that real estate to the lien of the judgment.

The complainant by his bill alleges, and the defendants by their answer admit, that judgment was recovered by him in the supreme court of this state, on the 6th of February, 1896, for the sum of $2,986.68, against Mrs. de Socarras, based upon an indebtedness which arose in the month of November, 1888. The defendants admit that Mrs. de Socarras was the owner of the premises from the 13th of July, 1891, up to November 8th, 1895, on which day she joined with her husband, Rudolfo de Socarras, Sr., in a deed of the same to Mr. McKenna, who, by a contemporaneous conveyance, reconveyed the premises to Mrs. de Socarras, in trust, for the benefit of her son, Rudolfo de Socarras, Jr., she to hold the title for his benefit, support and education during his minority, and at his majority the title to be vested in him, but if he should die before arriving at the age of twenty-one years, then the premises to vest absolutely and forever in the said Pauline de Socarras, her heirs and assigns.

Upon the case so made, the complainant's right to relief is clear.

But the defendants set up a defence which will be best understood by stating the facts upon which it is based.

Mrs. de Socarras' husband, the father of the infant defendant, is a Cuban by birth and a physician by profession, but has not practiced his profession to any great extent. At and prior to the month of November, 1888, he was engaged in the business of a caterer in the city of New York, and was financially unsuccessful and unable to support his family. Mrs. de Socarras had a sister who had married a wealthy gentleman by the name of Ballin, who lived in New York City, and she thought that, as her husband was improvident and inefficient, and not to be trusted to any extent with the handling of money, if she had

control of the business she could so manage it as to make a living for herself and family, and applied to her brother-in-law, Mr. Ballin, for assistance. He advanced her $2,000 and took therefor her sealed obligation, which provided that the money was to be used by her in the catering business, but that her husband should have no participation in or control of it, and that she should have therein the assistance of her father, Mr. Iauch, who was an experienced caterer and hotel-keeper. Mrs. de Socarras carried on the business for awhile, with the result that the investment was lost. She, however, paid three months' interest on the debt to Mr. Ballin.

Shortly after this—about the year 1890—her husband's mother, a wealthy Cuban, died, and at her death Dr. de Socarras received a fortune of about $13,000, as I interpret the evidence. About $9,000 of that he invested—May, 1891—in the house and lot at Long Branch which is the subject of the present litigation, and furniture to furnish it, moved into it with his family and commenced the practice of medicine. His concurrent declarations were that he intended the property for the benefit of his son, the defendant Rudolfo de Socarras, Jr. A few days or weeks after Dr. and Mrs. de Socarras were comfortably settled in the house they were visited socially by a friend, a Mr. Agramonte, when he learned the situation. In view of Dr. de Socarras' notoriously improvident habits and reckless disposition, Mr. Agramonte urged him to settle the property at once upon his son, and after considerable discussion between the doctor and his wife and Mr. Agramonte, it was agreed that the property should be conveyed to the wife, to hold for the son. The reason why it was not put in the son's name at once was that he was an infant, and it might become important to sell the property and change the investment. The conveyance was made through a third party to the wife, and, as she swears—and she is therein supported by Mr. Agramonte—upon the express verbal understanding that she was to hold it for the benefit of the son and in trust for him until he became of age.

The husband and wife lived together until the latter part of 1894, when his habits and conduct became such that cohabita-

tion became undesirable, and he left her, and has since spent part of the time in Cuba and part of the time in the neighborhood of New York, and she has not seen him since. Before leaving he had incurred some bills for the painting of the house and some other repairs, and Mrs. de Socarras was sued upon those bills and judgment went against her. She was also sued in a justice's court for some little sums and judgments recovered and levy made upon the furniture in the house. Litigations resulted therefrom, but before any judgment was docketed against her she entered into communication with her husband, through a third party, with the result that he consented to join her in a deed which created the settlement of November, 1895. About that time some difficulty arose between her and the complainant, who is her brother, which perhaps extended to her brother-in-law, Mr. Ballin. The particulars of the family difficulty were not developed and are of no consequence here, but the result was that Mr. Ballin, who had never, since 1889, demanded a dollar of Mrs. de Socarras on her obligation of November, 1888, made a gift of it, by assignment, to the complainant, and he brought suit upon it in the supreme court and recovered the judgment upon which this suit is founded.

The defence of the infant set up in his answer is that the settlement upon him was made strictly in pursuance of the verbal understanding at the time that the property was conveyed to his mother by his father. And the defence of Mrs. de Socarras, as manifested in her cross-bill, is that the $2,000 advanced to her by her brother-in-law in November, 1888, was a gift to her, and that the sealed obligation which she gave was a mere formality. This defence of Mrs. de Socarras was substantially abandoned by her counsel at the hearing when it appeared that she had made a payment of interest on account of it. And I may say further that the clear weight of the evidence is that it was a loan and not a gift, although it is palpable that Mr. Ballin never intended to enforce, and, but for the family difficulty, never would have enforced it. The only reason for referring to it here is that counsel for the complainant argued, with some force, that Mrs. de Socarras is so thoroughly contradicted in her evidence

with regard to the particulars of the transaction of that loan that her general credit as a witness in the cause is shaken. I think it sufficient to say on that topic that I was able at the hearing, and upon a reading of the evidence am still able, to see that it was a simple mistake on her part, which seems also to have been concurred in by the mutual counsel of the parties, Mr. Olcott, as to the true interpretation of the different conversations that occurred between her and Mr. Ballin on the subject. In point of fact, there is really no conflict in their evidence, but simply in the interpretation which each put upon it and their several recollections of it.

An attempt is made to directly contradict Mrs. de Socarras by showing that she made declarations inconsistent with her evidence in this cause as to the parol trust, on an occasion when she was examined as a witness at Freehold in one of the litigations that arose out of suits brought against her for her husband's debts. The pencil notes of her examination, taken by one of the counsel, seem to show that she swore positively that she did not hold the house and lot in trust for her son. But as this examination took place after the settlement in question was made, and as all the circumstances show beyond all peradventure that Mrs. de Socarras thoroughly understood the affair, it being made at her own instance, my conclusion is either that she misunderstood the question or that the counsel who took the notes misunderstood her answer or inadvertently inserted the word " not " in making his notes. I find it impossible to believe that she intentionally said what is attributed to her by the counsel and other witnesses.

It is admitted that Mrs. de Socarras never invested any money in the premises, and that they were purchased by her husband with his funds, and I find the fact to be that when they were conveyed by her husband, through an intermediary, to her it was upon the express verbal understanding that she should hold the premises for the benefit of their son, Rudolfo de Socarras, Jr. Mr. Agramonte swears, and the other evidence indicates, that she and her husband never had lived happily together, and that their relations never were such as to render it

Iauch v. de Socarras.

probable that her husband would make her an absolute present of this valuable house and lot, comprising nearly his whole fortune, to do with as she chose.

The simple question of law upon this state of facts is whether or not, in the absence of a written declaration of trust made at the time of the gift, the subsequent declaration is sufficient to validate it as against a creditor.

Counsel for the defendants made one other point, which, he argued, is sufficient of itself to defeat the complainant's claim, but, if not, certainly supports the other and main point which I have above stated. The point so taken is that the complainant is a mere volunteer, without any merit whatever; that neither he nor his assignor has expended a cent of money or altered their situation in the least upon the strength of her having any beneficial ownership in this property.

There is great force in that position. Certainly there is nothing in the complainant's position before the court to incline the court to look upon his case with any great favor. But I cannot say that that point is of itself sufficient to defeat his right in this court. He represents a just and honest debt. But it is further to be observed that that debt arose long before the purchase of this property, and when both the Doctor and Mrs. de Socarras were poor, and hence was not contracted upon the strength of any apparent ownership of the defendant Mrs. de Socarras. And, in my judgment, that is, after all, the real equitable ground upon which settlements of this kind are set aside. People do give credit, and have a right to give credit to others, upon the strength of their apparent ownership of property; and if this debt had been contracted to an outside person who had no notice of the secret trust, and while the title to these premises rested in her, the position of the complainant would be much stronger than it is.

But, taking the case as it is, the question now to be determined is whether or not a written declaration of trust, made a long time after the title has vested, but in good faith, and in strict accordance with the parol trust made at the time the title did vest, is valid against a creditor of the declarant. I think it is.

It was so held, in effect, by the court of appeals in the case of *Jamison* v. *Miller, 12 C. E. Gr. 586.* It is not necessary to state the facts of that case, which are not precisely like those here involved, and I simply refer to the language of Mr. Justice Dixon, found on *p. 592:* "The fact that these later writings were signed after the complainant's claims intervened, does not rob them of their efficacy under the statute. The writings are but evidence, the trust is anterior and independent, and the rights which the court regards are those that spring from the creation, not the mere proof of the trust. *There is no inequity in permitting the trustee of an express trust to make evidence upon which the courts can recognize and effectuate it, in order that the expectations of his creditors, who attempt to enforce their remedies against the trust estate, may be disappointed.*"

In support of his position he cites *Gardner* v. *Rowe, 2 Sim. & S. 346,* decided by Vice-Chancellor Leach, and affirmed, on appeal, by Lord Eldon in *5 Russ. 258.*

The very question was decided by Vice-Chancellor Green in *Silvers* v. *Potter, 3 Dick. Ch. Rep. 539,* where he collects all the authorities and discusses the question in a thoroughly satisfactory manner.

In the same direction is the case of *Davis* v. *Graves, 29 Barb. 480,* cited by me in the case of *Pitney* v. *Bolton, 18 Stew. Eq. 639* (at *p. 643*). The rule established by *Davis* v. *Graves* is this : That if A, being indebted, makes a conveyance to B for the purpose of defrauding his creditors, upon a secret trust that B will reconvey the property to A, and afterwards B becomes indebted also, and being pressed by his creditors reconveys the property to A in execution of the original parol trust, the creditors of B will not be aided by the court in disturbing the last conveyance.

I think the case is not altered by the fact, proven at the hearing, that Mrs. de Socarras was somewhat pressed by other creditors beside the complainant at the time the settlement was made. The complete answer to any argument from that situation is that the fact that Mrs. de Socarras held the title to the property in trust, provable only by parol, for her son, rendered it her clear

duty to give that son written evidence of that trust as soon as any danger arose that her creditors might intervene and appropriate it to the payment of their debts. In short, her duty to her son impelled her to take efficient means to "hinder and delay" her creditors in reaching this property, since, in conscience, it was not her own, and her creditors in that forum had no right to have it applied to the payment of their debts.

For these reasons I must conclude that the complainant's bill must be dismissed, with costs to be recovered by the defendants on their joint answer; and that Mrs. de Socarras' cross-bill must be dismissed, with costs to the complainant on his replication to her cross-bill, to be recovered against her individually.