Complainant, the holder of a judgment against William Yeskel, brings this bill of complaint.
The issue raised by the pleadings and the evidence involves the fraudulent use of judgments and corporate fictions to evade complainant's judgment. The defendants are William Yeskel, his son Stanley Yeskel and two corporations, namely, Stanley Trading Company and William Yeskel Sons, Inc.
Complainant sold and delivered merchandise to William Yeskel trading as William Yeskel and Company (a proprietorship which is not to be confused with William Yeskel Sons, Inc., a corporation), for which defendant William Yeskel gave complainant a note in payment for said merchandise *Page 405 
on November 26th, 1937. On December 23d 1937, defendant Stanley Yeskel wrote complainant, "There is maturing on the 26th of this month a note in the amount of $293.81 and we would ask that you please accept the following as full renewal." This letter was written on the stationery of William Yeskel and Company. The renewal was accepted. Subsequently complainant learned that William Yeskel's assets had been sold under execution.
The state of affairs which existed at the time the note was renewed was this: A judgment creditor had obtained a judgment against William Yeskel and levied upon his assets. Stanley Trading Company filed a claim of property. October 19th, 1937, the assets were adjudicated to be those of William Yeskel. October 27th, 1937, William Yeskel's assets were sold under execution and the property purchased by one Sweeney, an agent of the judgment creditor, for the nominal sum of $25. On the same day a contract was entered into between Harry Yeskel, a brother of William Yeskel, and Sweeney by which all the merchandise purchased at the execution sale was to be sold to Harry Yeskel for the sum of $502.04, $300 in cash and the balance by notes executed by Harry Yeskel and endorsed by Stanley Trading Company. Harry Yeskel then transferred the assets to Stanley Trading Company.
Stanley Trading Company a corporation had been formed by William Yeskel in 1931, and dissolved for non-payment of taxes in 1935 and reinstated in June, 1937. Yeskel had intended to use it for the purpose of trading in negotiable securities and had in fact used it to hold title to various automobiles which he used in his business.
When the execution sale of October 27th, 1937, took place there were numerous unpaid judgments against William Yeskel. He had no assets other than those contained in the business.
An audit of the assets of Stanley Trading Company as of the 31st of December, 1937, shows that the company had current assets valued at $9,808.73 and fixed assets valued at $6,733.54, while liabilities were $3,548.67; that all of the assets of Stanley Trading Company, with exception of the automobiles, came to it as the result of the transfer of the *Page 406 
assets of William Yeskel under the execution sale of October 27th, 1937, by which was accomplished the transfer of assets worth well in excess of $10,000 for the payment of the sum of $500, the evident purpose of which was to strip William Yeskel of all of his assets and place them into the hands of Stanley Trading Company.
Stanley Trading Company continued the same kind of business at the old stand, precisely in the same manner as the business which William Yeskel had been conducting, and with the same materials. What is more, the corporation continued to pay large liabilities of William Yeskel and to pay for his living expenses and made payments of money to him. According to the books of the company the debits to his account for the period of July 31st, 1937, to December 31st, 1937, amounted to $10,576.34 against which there were credits of only $2,468.27.
The defense offered is that ownership of Stanley Trading Company was in Harry Yeskel and Stanley Yeskel. Stanley Yeskel is the son of Harry Yeskel who at the time of the execution sale in October, 1937, and the transfer of the assets to Stanley Trading Company, had not yet attained the age of twenty-one. It is not at all likely that Stanley Yeskel could have financed the purchase of Stanley Trading Company. His earnings prior to the sale were very small, and it appears that he devoted them to the support of himself and his family. Books of the company produced to corroborate his story show that the money he gave the corporation was entered on the books as loans and not as investments. Stanley, according to the proof, did not know how many shares of stock he had in Stanley Trading Company or how many shares of stock his Uncle Harry had. He did not remember ever receiving or ever seeing a certificate of its stock although he said "I believe I was the president and treasurer." At first he testified that the money which he invested in Stanley Trading Company was never kept in a bank but kept in a hiding place in his home because he did not trust banks. Later he testified that the money came from various banks. The records of the banks he referred to failed to disclose an account in the name of Stanley Yeskel sufficient in size to supply the *Page 407 
money needed, or withdrawals in October, 1937, comparable to the amount paid. Any money put by Stanley Yeskel into Stanley Trading Company was not for the purchase of an interest therein but, as appears both by the check books of the company and by ExhibitC-6, as a loan to the company.
Harry Yeskel claims that the money he invested in Stanley Trading Company was made with money obtained from his wife. I do not credit this for neither his wife appeared nor was a bank account produced to corroborate his statement. On the contrary it appeared from the balance sheet of the company that, as of December 31st, 1937, the company was indebted to Harry Yeskel in the sum of $420. Harry Yeskel himself testified that he got out of the business and left it in the hands of "them," while Stanley Yeskel testified that Harry got back whatever he put in to the business.
On the 24th of September, 1938, the assets of Stanley Trading Company were again sold under execution and purchased by Stanley Yeskel from the execution creditor for the sum of $500. The assets were then turned over to William Yeskel Sons, a corporation formed on the 20th of December, 1938. Defendants claimed that Stanley Yeskel was the owner of the majority of the stock of William Yeskel Sons, Inc., and that William Yeskel had only a single share of stock in the company, although he was its president. It appeared that substantially all of the assets of Stanley Trading Company passed into the hands of William Yeskel 
Sons as the result of this transaction.
It is asserted that the money invested in William Yeskel 
Sons, Inc., was obtained by Stanley Yeskel from a savings account in the Fidelity Union Trust Company. The records of the bank show, however, that the maximum balance in the account with the Fidelity Union Trust Company was $31.47. It was also claimed that a loan was made from the Fidelity Union Trust Company which was used to finance William Yeskel Sons. But it appeared that the loan which was made from the Fidelity Union Trust Company, on the credit of William Yeskel as well as Stanley Yeskel was deposited to the account of Stanley Trading Company and not William Yeskel Sons. *Page 408 
Transfer of title from the execution creditor took place on December 12th, 1938. The price alleged to have been paid by Stanley Yeskel was about $500. By his own testimony the money was never kept in a bank. The inference fairly to be drawn from the evidence leads me to conclusion that Stanley Yeskel did not use his own funds to purchase the assets of Stanley Trading Company from the judgment creditor and that the funds used came either from Stanley Trading Company itself or from William Yeskel. Stanley Yeskel's testimony was utterly inconsistent with ownership of an interest in William Yeskel Sons, Inc. For instance, in a legal proceeding prior to this one he testified that he did not know who the corporate directors were; whether he owned stock in the company or not; whether he signed any corporate stock certificates or what transpired at the corporate meetings.
The testimony of all defendants is replete with evasive answers and attempts at concealment, particularly with regard to the source of the funds used to purchase William Yeskel's assets in the transactions referred to.
It is concluded from the testimony that both Stanley Trading Company and William Yeskel Sons, Inc., were in reality owned and operated by William Yeskel and were merely devices interposed by him between his assets and his creditors. Equity will in a proper case pierce through fiction to the reality. It will determine in whom the true ownership of assets lies and disregard legal title in its adjudication. McNulty v. McCarthy, 78 N.J. Eq. 365; affirmed (1911), 78 N.J. Eq. 585. Neither judgments (Bulova Watch Co., Inc., v. Zucker (Chancery, 1933),113 N.J. Eq. 431; Camden Safe Deposit and Trust Co. v. Green
(Chancery, 1938), 124 N.J. Eq. 221) nor the corporate entity (Trachman v. Trugman (Chancery, 1934), 117 N.J. Eq. 167;Newark Ladder, c., v. Furniture Workers, c. (Chancery,1939), 125 N.J. Eq. 99; Perkins v. Trinity Realty Co.
(Chancery, 1905), 69 N.J. Eq. 723; affirmed (1906),71 N.J. Eq. 304) can prevent it from doing so and from setting aside a fraud perpetrated by means of a legal form. The fraudulent intent in this case seems quite clear. Hard pressed by creditors the defendant William Yeskel with the connivance of *Page 409 
his son Stanley, attempted to hide his assets from their just claimants. The scheme by which the assets were to be withdrawn from the reach of creditors was well laid. In the language of the court in Gorsch v. Birkhahn (Chancery, 1930),151 Atl. Rep. 121 (not officially reported): "The conduct and transactions of the parties in an affair of this kind must be gauged and interpreted according to standards applicable to the ordinary everyday man or woman, and in the light of human experience. * * * It is true that the due formalities of all the various transactions were observed — too closely, I think; but that is just what is to be expected when the actors in a fraudulent transaction seek to cover their trail of fraud. Equity is not bound by the apparent form — `it looks at truth and reality through whatever disguise it may assume.'"
Decree for complainant will be advised. *Page 410