22 N.J. Super. 358 (1952)
92 A.2d 35
MARY COLES, ADMINISTRATRIX AD PROS. OF WILLIAM J. COLES, PLAINTIFF-APPELLANT,
v.
OSCAR OSBACK, MINNIE L. OSBACK AND EDWIN ERIC OSBACK, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1952.
Decided October 23, 1952.
*359 Before Judges JAYNE, PROCTOR and SCHETTINO.
Mr. John Warren argued the cause for plaintiff-appellant (Mr. Thomas F. Carlin, attorney).
Mr. Walter H. Jones argued the cause for defendants-respondents.
*360 The opinion of the court was delivered by PROCTOR, J.S.C. (temporarily assigned).
Plaintiff appeals from a judgment entered in the Chancery Division in favor of the defendants in an action to set aside an alleged fraudulent conveyance.
On December 18, 1947, William J. Coles was injured in a collision with a motor vehicle operated by the defendant Oscar W. Osback (hereinafter referred to as Oscar). Coles instituted a tort action but died before it was completed, and his wife was substituted as administratrix ad prosequendum. On January 12, 1948 the summons and complaint in the above action were served on Oscar. He and his wife Minnie L. Osback (hereinafter referred to as Minnie) held title to a house and lot at No. 441 Post Avenue, Lyndhurst, which had been conveyed to them by their son Theodore by a bargain and sale deed, dated April 16, 1945. By warranty deed, dated February 16, 1948, Oscar and Minnie conveyed the aforesaid property to their other son, Edwin Eric Osback (hereinafter referred to as Edwin). On December 28, 1949, judgment in the sum of $10,675 was recovered against Oscar.
The judgment in the tort action being unpaid, the plaintiff filed a complaint against Oscar, Minnie and Edwin, seeking to have the last mentioned conveyance set aside as fraudulent and the judgment in the tort action declared a lien upon the premises. Minnie died prior to the trial.
Defendants in their answer admitted the transfer but denied it was fraudulent. They further contended that the property had been purchased in 1940 by Theodore, whose conveyance to Oscar and Minnie in 1945 was to constitute them as trustees for Theodore; that in 1948 Theodore sold the premises to his brother Edwin, and that the conveyance from Oscar and Minnie to Edwin was pursuant to instructions from Theodore to carry such sale into effect.
The trial resulted in a judgment in favor of the defendants, Coles v. Osback, 13 N.J. Super. 367 (Ch. Div. 1951), from which plaintiff now appeals.
*361 The question for our determination is: Who was the real owner of the property at the time of the accrual of the tort action? This requires an examination of the facts and circumstances in relation to the successive conveyances of the property.
In the summer of 1940 the defendant Oscar and his wife Minnie conducted negotiations for the purchase of a home (the premises in question) from the Lyndhurst Building and Loan Association. The negotiations resulted in a sale of the property for $3,000, $300 to be paid in cash and the balance of $2,700 to be covered by a purchase money mortgage. The grantee in the deed was Theodore Osback, a son of Minnie and Oscar. At that time, Theodore was not quite 20 years of age, single and living with his parents. He took no part in the negotiations for the purchase of the property, other than allegedly making the down payment of $300 and signing the bond and mortgage, which likewise were executed by Oscar and Minnie. In relation to the sale Theodore testified:
"At the time I bought the property, I was twenty. My father was about fifty-five. As I understood between my mother and father and myself that his age was against him for getting a loan from the bank, or whatever the reason was, the bank wouldn't make the loan to him, but they would make the loan to me, and I paid the $300 which was the initial payment."
It also appears that at that time there was an unsatisfied judgment against Oscar, docketed in the former Supreme Court.
After the purchase Oscar and his family, including Theodore, moved into the premises. Theodore testified that Oscar made all the payments on the mortgage and also paid the taxes, water rents and insurance premiums. Theodore's interest in the property may be gathered from the following excerpts taken from his testimony:
"He (Oscar) made the payments, and from 1940 on, if he wasn't to finish the payments, I would continue, and then the house naturally *362 would be completely mine. I would pay back to him any  the amount of money, in other words, and if he couldn't make the payments, it was due to illness or age, or he was out of work, then I would give him back in the amount of money which he had paid in, during 1940, and that was originally planned with my mother in 1940. That is true."
"* * *  when we had originally bought the house, if my father couldn't keep up the payment, I was to continue, and, naturally, I had the mortgage, I would make the payments. Now, he made the payments."
"Q. Well, did your father pay you rent? A. He made the payments to the house, and if, in the event, that is the arrangement, if in the event that he could not make payments, I would continue to pay the mortgage. At the end of the time when the house was completely paid, evidently he wouldn't still not be able to work because of age, and I would return to him the money that he had paid into the house, and then the house then fully would be mine, and my mother and father would continue to live there."
Theodore married in May 1941 and with his wife continued to live with his parents. In November 1942 he entered the Navy. On April 16, 1945, while home on a furlough, he and his wife conveyed the premises to Oscar and Minnie. Theodore testified that his reason for so doing was that while at sea he "had a very close call" and that:
"* * * I felt that the house was meant for my mother and father to live in. I had insurance, the $10,000 insurance, which my wife would collect if I was killed, and I turned the house over to my father so that he would have a clear wording in any transactions he might want to do with the house, in the event that I was killed. In other words, my wife would not have anything  she would get the insurance, and my father and mother would have the house. That was the intentions of turning the house over to my parents."
He further testified that upon his safe return the house was to be reconveyed to him.
Theodore was discharged from the Navy in November 1945 and returned to live in the house with his wife and his parents. In June 1947 he moved to a two family house which he had purchased. At this time he and his wife had one child and were expecting another. The title to the Post Avenue house remained in the names of Oscar and Minnie until February 16, 1948, on which date they conveyed the *363 premises by warranty deed to their other son Edwin, who lived with them. Edwin was single and had been discharged from military service in May, 1946. The reason given by Theodore for the conveyance of the Post Avenue property from Minnie and Oscar to Edwin was:
"* * * I had an exemption on my own house, you don't get two exemptions, * * * my mother wanted it in the boy's name, * * *."
"I already had a house in June, I had bought a house, I had an exemption for one. Therefore, we planned this, to turn it to my brother's name, and that house  he is a veteran; he could also claim an exemption on that house  * * *."
He further testified that Edwin paid him $300 in cash which represented the down payment Theodore had made upon the purchase of the property:
"Yes, he gave me the initial  that $300 which was my interest, the money interest, back into the  he gave it to me."
At the time of the conveyance to Edwin the mortgage had been reduced, by payments made by Oscar, from $2,700 to $1,500. It was stipulated that the property was worth $10,000 at the time of the trial. Edwin testified that he paid Theodore $300 in cash and would continue to make the payments due on the mortgage; that when the mortgage was satisfied he would repay Theodore for the payments already made on the mortgage. The deed to Edwin had annexed thereto revenue stamps in the sum of $6.60. Edwin lived with his parents until he married in May, 1949, at which time he moved elsewhere. Oscar and Minnie continued to live in the house, Oscar making the payments on the mortgage and also paying the taxes, water rents and insurance premiums, as he had prior to the conveyance to Edwin.
An examination of the record convinces us that the testimony of the defendants was not reliable. It is our opinion that they did not hesitate to testify in a manner which would further their own interests, regardless of the truth. Their testimony was contradictory and conflicting. *364 Dealings between close relatives whereby the property of a debtor is conveyed to a member of his family are at best viewed with suspicion. Haberstroh v. DeMarco, 2 N.J. Super. 429, 432 (Ch. Div. 1949) and cases cited therein.
We find that Edwin in his pretrial deposition testified that he paid the $300 cash to Theodore "when I got the deed." The testimony is not clear when, if ever, Edwin received the deed but, in any event, it was not before the date of its execution, February 16, 1948. At the trial he testified the money was paid in September or October of 1947. In his pretrial deposition he was not sure whether it was paid at one time or in installments, but at the trial he was certain it was paid in one lump sum. Moreover, it is difficult to reconcile Edwin's alleged agreement to repay Theodore for payments made by the latter on the mortgage with the testimony of Theodore that he never made any such payments. Theodore had testified that Oscar made all the payments; that the arrangement was that if Oscar was unable to continue the payments Theodore would take over the property upon reimbursing Oscar for the latter's advancements. This contingency never occurred. Further, no explanation was given as to why Theodore, married and with two children, would sell for $3,000, to a younger brother who was single, a house and lot whose purchase price, according to the revenue stamps annexed to the deed, was $6,000 and the value of which at the time of the trial, January 3, 1951, was stipulated to be $10,000.
Oscar's testimony was also confusing. In his pretrial deposition he stated that Theodore purchased the property in 1940, "For the simple reason they (building and loan association) said that I would have been too old to borrow money." However, at the trial he emphatically denied that any such statement was made to him. Further, Oscar testified that in his presence Edwin paid the $300 to Theodore at a time when Theodore "needed more money in order to make his cash payment on this other building," title to which was taken by Theodore on June 1, 1947. He later testified *365 that the money was paid "somewheres around" September 1947. In his pretrial deposition he stated that he saw Edwin pay the $300 to Theodore on "The date of the deed," which was February 16, 1948. Also, Oscar stated in his pretrial deposition that the deed to Edwin was prepared by Attorney Savino, who annexed the revenue stamps and had the deed recorded; that he paid Savino $11 "For the recording of the deeds (sic), the stamps, and the making of the deed." He particularly remembered this charge because he had paid less for similar services on other occasions. He further testified that Attorney Gallagher, who represented him in the then pending tort action, had refused to draw the deed. At the trial Attorney Gallagher testified that he prepared the deed and gave it to Oscar. Attorney Savino testified that Oscar and Minnie came to his office with the unexecuted deed and asked him to take the acknowledgment of their signatures; that he filled in the date of the deed, took their acknowledgments and printed on the back, "Return to Oscar Osback 441 Post Avenue Lyndhurst." He noticed that there were no revenue stamps on the deed. He said nothing to them about it, did not arrange for any revenue stamps to be annexed, and they took the executed deed away with them. He merely took the acknowledgments and made no charge therefor. After the two attorneys testified, Oscar admitted that Gallagher prepared the deed but stated he did not know who placed the revenue stamps thereon.
From the record it appears that none of the witnesses had any knowledge as to when or by whom or for what reason revenue stamps in the amount of $6.60, representing a purchase price of $6,000, were annexed to the deed. The defendants admitted that the purchase price for the property was to be only $3,000.
Theodore testified that when he conveyed the property to his father on April 16, 1945, it was to be reconveyed to him upon his safe return. Although he returned in November 1945, no reconveyance was made to him nor was the property conveyed to Edwin, at the alleged request of Theodore, *366 until February 16, 1948. It is significant that the latter conveyance was more than two years after Theodore's safe return but less than five weeks after Oscar had been served with the summons and complaint in plaintiff's tort action.
Oscar contended that his advancements to the building and loan association and his payments of the taxes were in lieu of rent payments. This was directly contrary to Theodore's understanding of their relationship. The excerpts from the latter's testimony quoted above show that Theodore understood that if Oscar defaulted in the making of the mortgage payments or taxes, then Theodore would continue such payments and reimburse Oscar for the payments theretofore made and only in that event would Theodore consider himself to be the owner of the property. Theodore's testimony belies the theory that the advancements made by Oscar were to be considered in the nature of rent.
We are convinced from the record that Theodore's role in the original purchase of the property in 1940 was a passive one and constituted him a constructive trustee for Oscar and Minnie, who were the real beneficial owners of the property. Property of a debtor is equally available to his creditors, whether the debtor had title and made a fraudulent transfer or purchased from a third party and had the third party transfer the title directly to the debtor's nominee. Englander v. Jacoby, 132 N.J. Eq. 336, 337-338 (Ch. 1942). In conveying the property to Oscar and Minnie in 1945, Theodore was performing a moral obligation and they became the owners of the legal as well as the equitable title. Theodore had held the title to the property in trust, provable only by parol, for his parents. In 1945 he discharged his obligation as trustee by giving his parents written evidence (the deed) of the true title to the property to avoid jeopardizing their interest in the event he failed to return from the service. Compare Iauch v. De Socarras, 56 N.J. Eq. 538 (Ch. 1898). Thereafter Theodore had no interest in the property and was in no position to instruct his parents to convey the property to his brother. Oscar and Minnie, *367 without receiving any consideration from Edwin, conveyed the property to him at the time when the tort action was pending against Oscar, at which time, Oscar admitted, he was insolvent. A tort claimant, having reduced the claim to judgment, may attack a voluntary conveyance made to defeat the debt after the liability arose, on the theory that such judgment when once obtained relates back and establishes a debt as of the time when the original cause of action accrued. Babirecki v. Virgil, 97 N.J. Eq. 315, 318-319 (E. & A. 1925).
Where the controversial issue is essentially factual, as here, we are empowered to review the evidence and may make our own findings where in our judgment the interest of justice so requires. Rule 1:2-20(a) and Rule 4:2-6. Series Publishers, Inc. v. Greene, 9 N.J. Super. 166, 171 (App. Div. 1950).
The judgment of the Chancery Division is reversed and the conveyance dated February 16, 1948, from Oscar W. Osback and Minnie L. Osback to Edwin Eric Osback, is declared void as against plaintiff's judgment heretofore recovered against Oscar W. Osback in the Law Division.
Reversed.