275 N.J. Super. 556 (1994)
646 A.2d 1112
JOHN JUGAN, PLAINTIFF-APPELLANT,
v.
STUART FRIEDMAN, M.D., DOROTHY FRIEDMAN, A/K/A DOTTY FRIEDMAN, PRINCETON INSURANCE COMPANY AND SETH FRIEDMAN, SANDER FRIEDMAN, STEPHEN FRIEDMAN AND JOHN DOES, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1994.
Decided July 13, 1994.
*559 Before Judges DREIER, BROCHIN and KLEINER.
Todd Brandon Eder argued the cause for appellant (Garruto, Galex & Cantor, attorneys; Mr. Eder, on the brief).
Stuart J. Friedman, M.D. argued the cause for respondent pro se.
No other parties participated in this appeal.
The opinion of the court was delivered by BROCHIN, J.A.D.
In September 1984, plaintiff John Jugan commenced an action against defendant Stuart Friedman, M.D., to recover damages for personal injuries which resulted from medical malpractice committed by Dr. Friedman in the fall of 1982. In March 1988, the jury awarded Mr. Jugan compensatory damages of $10,000 and punitive damages of $150,000. No appeal was taken from the judgment entered on that verdict, and Dr. Friedman has not attempted to impugn its validity. The present suit deals with plaintiff's attempt to collect on his judgment.
The trial record in this suit does not disclose the facts on which the verdict for medical malpractice was based. However, a published decision rendered by this court in a related case, Jugan v. Pollen, 253 N.J. Super. 123, 127, 601 A.2d 235 (App.Div. 1992), summarizes the facts as follows:
Mr. Jugan was put in traction, operated upon unnecessarily by both defendant Dr. Pollen and then-defendant Stuart Friedman, M.D., for a laminectomy (disc removal and spinal fusion surgery). He was then post-operatively mistreated. Not only did the mistreatment cause severe pain, but Dr. Friedman, an addict, appropriated for himself the pain medication (Demerol) intended for the patient, leaving Mr. Jugan to suffer with little or no pain medication following the back surgery....
The history of Dr. Friedman's drug abuse and the consequent criminal convictions, disciplinary proceedings, and malpractice actions forms the background of the present suit. His medical license was suspended from November 1976 to July 1977 as the result of his arrest for unlawful possession and use of a controlled *560 dangerous substance. In 1977, he pleaded guilty to obtaining a controlled dangerous substance by fraud. His license was suspended again in January 1978 for drug abuse and was conditionally reinstated in February 1978; his privilege to prescribe narcotic drugs was reinstated in October 1978. In the late fall of 1982, he was hospitalized for drug rehabilitation. In March 1983, he pleaded no contest to charges of writing prescriptions for a controlled dangerous substance for his own use and his license was suspended for three years; however, the suspension was stayed pending his compliance with certain restrictions and conditions relating to controlled dangerous substances. In March 1983, he was arrested on drug charges. In March 1984, he was convicted of drug charges after a guilty plea. His medical license was suspended for sixty days beginning September 1, 1984 for failure to comply with the conditions and restrictions imposed at the time of his 1983 license suspension. His New Jersey medical license was suspended in August 1986 and subsequently revoked. His New York license was revoked in January 1987, and his Florida license, in August 1988.
Mr. Jugan and his wife filed their malpractice action against Dr. Friedman on September 28, 1984. Dr. Friedman's malpractice coverage was canceled on October 1, 1984. Six other malpractice actions were filed against him between June 27, 1983, and September 24, 1987.
Dr. Friedman's malpractice insurer paid the compensatory damages awarded to Mr. Jugan, but not the punitive damages. Efforts to collect the punitive damages disclosed that there were no assets in Dr. Friedman's name except for disability policies and a Florida marital residence which, the parties agree, are immune from levy.
The present suit is an effort to recover the punitive damages awarded in the prior action and the expense of collecting them. Mr. Jugan's complaint alleges that Dr. Friedman has conveyed all of his assets to his wife, Dorothy Friedman, and to his adult sons, Seth, Sander, and Stephen Friedman, "for the purpose of defrauding *561 his creditors, including the plaintiff, and hindering and delaying the collection of the money due to the plaintiff." The complaint seeks, among other things, discovery of the nature and location of Dr. Friedman's assets, payment of the unpaid balance of the malpractice judgment out of property which Dr. Friedman has fraudulently conveyed, and a judgment for compensatory and punitive damages, interest, and costs.
After numerous discovery motions and extensive discovery, the case was tried to the court for ten days. The evidence introduced at trial identified two principal assets, besides a Florida residence and Dr. Friedman's disability insurance policies, into which he had converted his accumulated capital. These assets are a $1,600,000 life insurance policy on Dr. Friedman's life issued by Pacific Mutual Life Insurance Company and a $500,000, twenty-year, purchase money, second mortgage representing part of the price received from the 1985 sale of property known as 799 Inman Avenue, Woodbridge, New Jersey.
As of August 1992, the Pacific Mutual Life Insurance Company policy had a cash surrender value of $542,316.39. Mrs. Friedman is its sole primary beneficiary and its nominal owner. The trial court found that Dr. Friedman was the source of the assets used to acquire the life insurance policy and that he had fraudulently transferred those assets to his wife.
The 799 Inman Avenue property had been purchased in Mrs. Friedman's name and she was the mortgagee. The court found that Mr. Jugan did not disprove defendants' claim that Mrs. Friedman had purchased the 799 Inman Avenue property principally with her own funds.
The court determined that, beginning some time during the 1980's, Dr. Friedman had transferred his assets to his wife and children with a "fraudulent intent." According to the court's findings, "at least one of the motivating factors" for those transfers was Dr. Friedman's concern that punitive damages from which he was not protected by malpractice insurance would be awarded against him in threatened or pending medical malpractice *562 suits. The court found specifically that when Dr. Friedman purchased the life insurance policy in Mrs. Friedman's name, his purpose included "attempt[ing] to give preference to his family in derogation of the debt owed to Mr. Jugan."
The trial judge's findings as to Dr. Friedman's intent were based in part on the trial testimony of a former investigator for the Department of Law and Safety, Consumer Affairs, Enforcement Bureau. He told the court that his report to the State Medical Board quoted Dr. Friedman as having stated that
as a result of a former Enforcement Bureau investigation there are five lawsuits now pending against him. He remarked that he does not care about this because he cannot obtain and does not presently have any malpractice insurance and that even if he should kill a patient on the operating table, plaintiffs would get nothing from him as he has transferred all of his possessions to his wife's name.
The trial judge refrained from making any express finding whether Dr. Friedman's wife and sons shared his intent to defraud creditors. (However, the final judgment recites that "neither Seth Friedman, nor Sander Friedman, nor Stephen Friedman has been demonstrated to have participated in the aforesaid fraudulent transactions of Stuart Friedman, M.D.") The court concluded that whether Seth, Sander, and Stephen Friedman knew of their father's fraudulent purpose in making the transfers was immaterial because they did not claim to have paid consideration for the assets which he put in their names. However, the court went on to say that they should have been aware of the fraud and would be deemed to have been aware of it because they ceded their father full authority over the assets in their names and over their income tax returns, allegedly by executing powers of attorney in his favor. The court found that Mrs. Friedman was probably aware of the fraudulent purpose for her husband's transfers.
The trial judge also found that Dr. Friedman had become insolvent by divesting himself of all assets except for his disability insurance and Florida residence, which were beyond the reach of creditors.
On the basis of these findings, the trial judge ruled that Mr. Jugan was entitled to a judgment for the $150,000 of unpaid *563 punitive damages awarded in the malpractice action, together with interest thereon from the date of entry of the judgment in that action. He held that the amount of the judgment in the present suit should be collected from the cash surrender value of the Pacific Mutual Life Insurance Company life insurance policy. He rejected the defendants' contention that Florida law sheltered that policy from levy. Since defendants had served Mr. Jugan with a notice to testify, compelling him to travel to New Jersey for the trial when he would not otherwise have done so, the court included his reasonable travel expenses in his suit costs.
The court declined to award interest on the $150,000 punitive damage award for any period before the date of entry of the judgment in the prior action or to award attorneys' fees on any basis, including N.J.S.A. 2A:15-59.1, the frivolous litigation statute. The court also rejected plaintiff's argument that defendants' interference with his attempt to collect on his judgment was an independent tort for which he should be entitled to compensatory and punitive damages against Dr. Friedman as the principal tortfeasor and against the other defendants as co-conspirators.
A judgment was entered in accordance with these rulings. The judgment ordered that the prior restraint on the value of the Pacific Mutual Life Insurance Company policy would remain in effect but only to the extent of the judgment entered in favor of Mr. Jugan. Mr. Jugan's motion for a stay of that portion of the judgment which vacated the prior restraints except to the extent necessary to satisfy the judgment was denied. The judgment has now been fully paid from the cash surrender value of the Pacific Mutual Life Insurance Company policy. On Mr. Jugan's application, this court enjoined the Friedmans, pending our determination of this appeal, from disposing of any part of the remaining value of that policy.
Mr. Jugan has appealed. He contends that the trial court erred in finding that he failed to prove that Seth, Sander, and Stephen knowingly participated in Dr. Friedman's fraudulent transfers and that the 799 Inman Avenue mortgage was fraudulently transferred *564 to Mrs. Friedman. Mr. Jugan also appeals the denial of his claims for litigation costs and attorneys' fees and the rejection of his claim for compensatory and punitive damages for defendants' interference with his attempts to collect on his judgment.
Dr. Friedman has cross-appealed. He contends that there is no evidence in the record to support the trial court's finding that he intended to defraud Mr. Jugan and that the Pacific Mutual Life Insurance Company policy is owned by Mrs. Friedman and is exempt from levy. He also claims that Mr. Jugan's reasonable expenses for attending the trial were not properly included in taxed costs.
The evidentiary basis of Mr. Jugan's claim that the $500,000 purchase money mortgage from the sale of 799 Inman Avenue was fraudulently transferred to Mrs. Friedman consists almost entirely of the testimony of Jeffrey Katz, a certified public accountant. Testifying as an expert witness for Mr. Jugan, Mr. Katz expressed the opinion that Dr. Friedman must have provided all or most of the approximately $300,000 cash which was paid for Mrs. Friedman's July 1984 acquisition of 799 Inman Avenue because she did not have adequate resources of her own. However, Mr. Katz's testimony on this issue was flawed by two critical errors. The first was an arithmetical error and the second was an error of fact.
Mrs. Friedman testified that between 1974 and 1984 she had earned income of her own. To account for that income, Mr. Katz told the court that even if Mrs. Friedman had earned $20,000 a year after taxes during that ten-year period and had deposited it in an account which paid interest at an eight percent annual rate, the total amount accumulated would have been $155,000. That is obviously incorrect. The aggregate principal amount alone would have equaled $200,000. With interest at eight percent a year, compounded annually, a deposit of $20,000 a year at the end of each year for ten years would produce a total of $289,731.23.
*565 Mr. Katz's second error was that, when he testified from the witness stand, he did not take into account that Mrs. Friedman had received $232,831 in 1983 or 1984 from the testamentary estate of Hortense Zager, Mrs. Friedman's mother. Mrs. Zager's will provided that Mrs. Friedman would receive her share in trust, but she received it outright as the result of a family settlement. In examining Mr. Katz, Mr. Jugan's lawyer asked him to assume that the principal of the bequest was not available to Mrs. Friedman. That was the premise of Mr. Katz's testimony that the bulk of the cash to acquire the 799 Inman Avenue property must have come from Dr. Friedman.
Mr. Katz's expert report, which Mr. Jugan's attorney exhibited to the judge during the witness's testimony, states:
Dorothy Friedman's inheritance from Hortense Zager was used to purchase the property at 799 Inman Avenue. When this property was sold[,] Ms. Friedman received a $500,000 mortgage on the property. In essence, the money she received from Hortense Zager was invested in the $500,000 mortgage.[1]
The evidence thus amply supported the trial judge's conclusion that plaintiff failed to prove his claim that the $500,000 purchase money mortgage in Mrs. Friedman's name was derived from Dr. Friedman's assets which had been fraudulently transferred to her.[2] We are bound by that determination, Rova Farms Resort, *566 Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). We therefore reject Mr. Jugan's contention that the proceeds of that mortgage should be treated as Dr. Friedman's property for purposes of levy.
With one exception, the material facts relating to the accumulation and transfers of the funds which ultimately found their way into the Pacific Mutual Life Insurance Company policy are substantially undisputed. The trial begins with Dr. Friedman's purchases of bearer bonds in 1973 through Bruce Baumgarten. When Dr. Friedman started doing business with Mr. Baumgarten, Mr. Baumgarten was a salesman at Gibraltar Securities. Mr. Baumgarten moved to Hamilton Cook & Company in 1973. He returned to Gibraltar Securities in 1979 and was employed by that firm when he testified at trial. Dr. Friedman purchased securities through Mr. Baumgarten until approximately 1986.
Initially, the account under which Dr. Friedman purchased bonds from Mr. Baumgarten was in Dr. Friedman's name, but Dr. Friedman told Mr. Baumgarten he was buying the bonds for his sons. In 1983, accounts were opened in the names of each of Dr. Friedman's sons, and Dr. Friedman began to purchase registered securities in their names. Dr. Friedman also opened one account in his wife's name.
These investments were liquidated in 1986 and 1987, and, through Carlo Squicciarini, a salesman who was then employed by Nicholas Lawrence, a stock broker, the proceeds were invested in various securities in the names of Mrs. Friedman and the three sons. When Mr. Squicciarini left Nicholas Lawrence for employment as a salesman, first at Dean Witter Reynolds and then at Prudential Bache, Dr. Friedman moved the accounts to follow him. In addition to Dr. Friedman's investments through Mr. Squicciarini, *567 he may also have made other investments in mutual funds and government bonds. Sometime during the period from approximately 1986 to October 1987, the Friedmans' home was mortgaged and the proceeds appear to have been added to their investment accounts.
From the various investment accounts which Dr. Friedman maintained in the names of Mrs. Friedman and their three sons, Dr. Friedman purchased four annuity policies from The Equitable Life Assurance Society. One annuity policy was in Mrs. Friedman's name and for her benefit, and each one of the other three policies was in the name and for the benefit of one of the sons. All four of the annuities were liquidated in July 1991. The Pacific Mutual Life Insurance Company policy was purchased in 1991 for a total premium of $637,286.99. This entire amount was paid in full by the end of 1992. Dr. Friedman signed the application for the policy in Mrs. Friedman's name. Dr. Friedman conceded that the money for payment of the Pacific Mutual Life Insurance Company premium came from liquidation of the annuities.
As we previously mentioned, there is one area of disagreement between plaintiff and defendants about the money trail. Dr. Friedman contends that although there were transfers of assets between his wife and his sons, he did not transfer any assets at times and under circumstances that made those transfers fraudulent. He argues that any transfers from him to his family were accomplished when he purchased bearer bonds for his sons during and prior to 1983. He alleges that he was not insolvent when he made those purchase and he did not intend to avoid creditors. He also asserts that all, or substantially all, of the increase in his family's investment securities since that time resulted from income and profits which accrued to those initial investments which he made for his wife's and sons' benefit. Cf. Carluccio v. Winter, 108 N.J. Eq. 174, 177-78, 154 A. 427 (E. & A. 1931) (gifts made by a debtor while solvent cannot be attacked by someone who was not a creditor when the gifts were made).
*568 Plaintiff, on the other hand, contends that Dr. Friedman began making fraudulent transfers when he opened investment accounts in his wife's and sons' names in and after 1983. Plaintiff claims that those transfers were effected with the actual intent to put assets beyond the reach of malpractice claimants, including Mr. Jugan whose claim accrued in 1982, and that these transfers made Dr. Friedman insolvent by divesting him of all assets which could be reached by creditors.
With adequate basis in the record, the trial court adopted plaintiff's view and we accept its findings. Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495.
Dr. Friedman concededly transferred assets to his wife and sons without receiving any material consideration in exchange. See N.J.S.A. 25:2-9;[3]Kowal v. Sudol, 132 N.J. Eq. 61, 62, 26 A.2d 795 (Ch. 1942). Mr. Jugan is a present creditor of Dr. Friedman and, to the extent of any unpaid tort claim against Dr. Friedman which has been established by judgment, Mr. Jugan will be treated as having become a creditor when his claim accrued. N.J.S.A. 25:2-7; Washington Nat'l Bank v. Beatty, 77 N.J. Eq. 252, 256, 76 A. 442 (E. & A. 1910); Coles v. Osback 22 N.J. Super. 358, 367, 92 A.2d 35 (App.Div. 1952), certif. denied, 11 N.J. 330, 94 A.2d 549 (1953). Therefore, since Dr. Friedman transferred assets "with actual intent ... to hinder, delay, or defraud either present or future creditors ...," N.J.S.A. 25:2-13; Green v. Carroll, 116 *569 N.J. Eq. 1, 3, 172 A. 202 (Ch. 1934); Washington Nat'l Bank, supra, 77 N.J. Eq. at 257, 76 A. 442, or with the "inten[t] or belie[f] that he will incur debts beyond his ability to pay as they mature," N.J.S.A. 25:2-12; see Roxbury State Bank v. Clarendon, 129 N.J. Super. 358, 375-76, 324 A.2d 24 (App.Div.), certif. denied, 66 N.J. 316, 331 A.2d 16 (1974); cf. Sweney v. Carroll, 118 N.J. Eq. 208, 216, 178 A. 539 (Ch. 1935), Mr. Jugan is entitled to void the transfer as fraudulent, regardless of whether or not Dr. Friedman was insolvent when the transfer was made.
Alternatively, even if Dr. Friedman did not have the intent or belief required by N.J.S.A. 25:2-12 or -13, Mr. Jugan can successfully attack a transfer as fraudulent if he proves that he was a creditor when the transfer was made and Dr. Friedman was then insolvent or would be rendered insolvent by the transfer, N.J.S.A. 25:2-7 and -10; In re Fleet, supra, 89 B.R. at 427. On both bases, we agree with the trial judge's conclusion that Mr. Jugan is entitled to trace Dr. Friedman's assets into the Pacific Mutual Life Insurance Company policy in Mrs. Friedman's name and to levy against the cash surrender value of that policy to satisfy his claim.[4]
There is also another ground upon which we sustain plaintiff's right to treat the life insurance policy as Dr. Friedman's for purposes of satisfying his judgment. Whatever doubt there may be about Dr. Friedman's motives and intent in acquiring and transferring the assets which eventually were liquidated to purchase *570 the Pacific Mutual Life Insurance Company policy, there is no doubt or dispute that, as Dr. Friedman expressly admitted, he was their source. Furthermore, they never became completed gifts because he has continuously exercised absolute, exclusive control over all of these investment assets. See Hoey v. Dell, 7 N.J. Super. 398, 400-01, 71 A.2d 394 (Ch.Div.) (requirements for a "valid gift" are donative intent on part of the donor, actual delivery of the subject matter of the gift, and surrender by the donor of all control and dominion over the subject matter of the gift), affd, 10 N.J. Super. 185, 76 A.2d 836 (App.Div. 1950); see also Gordon v. Toler, 83 N.J. Eq. 25, 27, 89 A. 1020 (Ch. 1914) (where a person intends to retain, and does in fact retain, control of the subject matter of an alleged gift, gift will be deemed incomplete and void). In whatever account and in whosever name the securities were held, Dr. Friedman bought, sold, and transferred them  from himself to his sons and wife, from his wife to his sons, from his sons to his wife  without seeking the advice or consent of any family member. Essentially, no one but Dr. Friedman had any business dealings with the various securities salespersons through whom he made his purchases. He signed his sons' and his wife's names on income tax returns, insurance policy applications and other documents. Stephen, Seth, Sander, and Dorothy Friedman disclaimed all knowledge of or interest in the investment accounts in their name, why various investments were liquidated, or what was done with the proceeds.
These facts demonstrate that Mr. Jugan is entitled to satisfy his claims against Dr. Friedman from the Pacific Mutual Life Insurance Company policy, not only because it was acquired by means of assets which were fraudulently transferred, but because, in reality, it is merely the most recent incarnation of assets belonging to Dr. Friedman which he never transferred at all. He always retained all of an owner's prerogatives with respect to his investments and merely attempted to disguise his ownership in order to defraud creditors, including, as the family's income tax returns indicate, the United States Government. But *571 our courts will not permit a creditor to be foiled by such transparent disguises. Even someone who became a creditor after the purported transfer can levy against the property to satisfy his judgment claims against the true owner. See Passaic Nat. Bank & Trust Co. v. Taub, 136 N.J. Eq. 50, 51-52, 40 A.2d 198 (Ch. 1944), aff'd, 137 N.J. Eq. 544, 45 A.2d 679 (E. & A. 1946); Goldberg v. Yeskel, 129 N.J. Eq. 404, 408, 20 A.2d 656 (Ch.), aff'd, 129 N.J. Eq. 410, 19 A.2d 788 (1941); McNulty v. McCarthy, 78 N.J. Eq. 365, 371, 81 A. 568 (Ch.), affd, 78 N.J. Eq. 585, 81 A. 1134 (E. & A. 1911). We therefore reject Dr. Friedman's cross-appeal from the provision of the judgment which authorizes plaintiff to levy on the cash surrender value of the Pacific Mutual Life Insurance Company policy in Mrs. Friedman's name.
We turn next to the question whether Dr. Friedman's fraudulent interference with Mr. Jugan's efforts to collect his judgment debt is an independent tort entitling him to damages and, if so, what the measure of those damages is in the present case.
We have held that Dr. Friedman purposely disguised his continuous, absolute control over the investment securities which he purchased in his family members' names and that, by the fraudulent paper record which he created, he falsely represented to creditors that he was without assets which were subject to levy. We have affirmed the trial court's determination that he acted with the purpose of making his assets unavailable to his legitimate creditors. Dr. Friedman's false pretenses compelled Mr. Jugan to incur the expense of the present action to establish the falsity of the Friedman family's record titles and to set aside the purported transfers.
These actions by Dr. Friedman and the remedial responses reasonably taken by Mr. Jugan are closely analogous to the standard elements of legal fraud. To prove legal fraud, a plaintiff must show that the defendant made an intentionally false representation of past or present fact, intending that the plaintiff rely thereon, and that the plaintiff did rely to his detriment. Jewish *572 Ctr. v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981); Ramapo Bank v. Bechtel, 224 N.J. Super. 191, 197, 539 A.2d 1276 (App.Div. 1988). The anatomy of this case differs from that of a run-of-the-mill case of legal fraud only with respect to the defendant's reliance. Mr. Jugan did not undertake the present action because he was fooled by Dr. Friedman's false representations. He sued to set the purported transfers aside because he knew they were false. Nonetheless, Dr. Friedman's conduct was clearly unlawful and it is closely enough analogous to common-law fraud that we have no hesitancy in ruling, as we do, that it was tortious and that Mr. Jugan is therefore entitled to recover for damage of which that tort was the proximate cause. Furthermore, since this claim for damages was alleged in Mr. Jugan's complaint, and since it does not rest on any facts which defendants did not anticipate, we conclude that they were not prejudiced by plaintiff's failure until his summation to assert that Dr. Friedman's fraudulent transfers constituted a tort for which damages should be awarded. Cf. Viviano v. CBS Publications, Inc., 251 N.J. Super. 113, 129, 597 A.2d 543 (App.Div. 1991), certif. denied, 127 N.J. 565, 606 A.2d 375 (1992) (trial court's willingness to permit plaintiff to seek compensation for increased expenses two weeks before trial was a determination within the court's discretion where defendants failed to show that they were prejudiced by the decision).
We hold that under the circumstances of this case, punitive damages, other than those awarded for the original tort, are not available. Every fraud is reprehensible, but not every fraud or fraudulent transfer warrants punitive damages. Fischer v. Johns-Manville Corp., 103 N.J. 643, 654-55, 512 A.2d 466 (1986) ("Punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious.") (quoting Leimgruber v. Claridge Assocs., 73 N.J. 450, 454, 375 A.2d 652 (1977)). The conduct of the defendants in the present case was not so egregious that it meets those criteria.
*573 In the present case, the only compensatory damages which plaintiff has claimed for the defendants' fraud is his litigation expenses, including attorneys' fees. As a general rule in New Jersey, each party must bear its own litigation expenses, including attorneys' fees. Right to Choose v. Byrne, 91 N.J. 287, 316, 450 A.2d 925 (1982); Oliviero v. Porter Hayden, 241 N.J. Super. 381, 386, 575 A.2d 50 (App.Div. 1990). However, one of the exceptions to this rule is that if the commission of a tort proximately causes litigation with parties other than the tortfeasor, the plaintiff is entitled to recover damages measured by the expense of that litigation with third parties. Feldmesser v. Lemberger, 101 N.J.L. 184, 186-88, 127 A. 815 (E. & A. 1925) (permitting recovery of litigation costs against a tortfeasor, including attorney's fees, by a party who is forced into litigation with a third party as the result of the tortfeasor's fraud); Katz v. Schacter, 251 N.J. Super. 467, 473-74, 598 A.2d 923 (App.Div. 1991) (same), certif. denied, 130 N.J. 6, 611 A.2d 646 (1992); Dorofree v. Planning Board, 187 N.J. Super. 141, 144, 453 A.2d 1341 (App.Div. 1982) (same); Hagen v. Gallerano, 66 N.J. Super. 319, 332-33, 169 A.2d 186 (App.Div. 1961) (same).
Under our current rules of procedure, a plaintiff may litigate in the same suit with both the tortfeasor and the third parties with whom the tortfeasor has caused him to become embroiled because of the tort. For example, in Department of Envtl. Protection v. Ventron, 94 N.J. 473, 468 A.2d 150 (1983), a case in which the owner of real estate defrauded a developer into buying polluted property, the developer's damages included his attorneys' fees for the State's claims for the cost of remedying the pollution, although that issue was litigated in the same action as the issue of the owner's fraud. Id. at 504-05, 468 A.2d 150. Similarly in the present case, although Mr. Jugan may not recover his litigation expenses for litigating with Dr. Friedman to establish that his transfers were fraudulent, he is entitled to reimbursement for reasonable attorneys' fees expended in litigating with third parties, including the other defendants, to void or set aside the transfers. Obviously, the total attorneys' fee incurred cannot be *574 allocated with any exactitude and a reasonable approximation will suffice. Since, strictly speaking, attorneys' fees are recoverable, if at all, in this litigation only as damages measured by reasonable litigation expenses, they must be proved in open court like any other damages unless the parties agree otherwise. Cohen v. Fair Lawn Dairies, Inc., 44 N.J. 450, 451, 452, 210 A.2d 73 (1965).
The trial court rejected plaintiff's contention that he is also entitled to attorneys' fees under the frivolous litigation statute, N.J.S.A. 2A:15-59.1. See McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561-63, 626 A.2d 425 (1993). We hold that that ruling was not an abuse of discretion.
We also affirm the trial court's discretionary ruling that Mr. Jugan's expenses for attending the trial in order to be available as a witness for defendants are includable in the costs that were taxed against defendants. N.J.S.A. 22A:2-8. The court found without dispute that Mr. Jugan traveled to the court from Florida only because defendants demanded that he be available to them as a trial witness, but they did not call him to the witness stand and he did not testify. This is obviously a different situation from one in which a party attends a trial for his own purposes; in that case, his expenses are not taxable as costs. Cf. A.J. Tenwood Assocs. v. Orange Senior Citizens Housing, 200 N.J. Super. 515, 491 A.2d 1280 (App.Div.), certif. denied, 101 N.J. 325, 501 A.2d 976 (1985).
The trial court refrained from making any definitive ruling on whether the defendants other than Dr. Friedman were co-conspirators with him in attempting to defraud creditors. Since plaintiff has recovered the damages which he has already been awarded and the remaining cash surrender value of the Pacific Mutual Life Insurance Company policy is more than ample to satisfy additional damages, the issue of the extent of the complicity of Mrs. Friedman and their sons is moot. No justifiable purpose would be served by our requiring the trial judge to make a definitive determination of that issue.
*575 This case is remanded to the trial court for further proceedings not inconsistent with this opinion.
The injunction now in effect enjoining any disposition by the defendants of the remaining cash surrender value of the Pacific Mutual Life Insurance Company policy on Dr. Friedman's life shall, until dissolved by the trial court, remain in force in order to facilitate collection of any further judgment which may be entered in the course of the remand proceedings.
NOTES
[1] The report goes on to say:

The other significant assets which Dorothy Friedman owns and were purchased with funds that originated with Dr. Friedman are the residence in Boca Raton, Florida and the mortgage on the property [known] as 799 Inman Avenue in New Jersey from the Parsons Investment Group. This writer has been advised that the current fair market value of the residence, net of mortgages, is approximately $200,000. The Parsons Investment Mortgage has a balance of approximately $425,000.
This paragraph quoted from the report mistakenly assumes that the Parsons Investment Mortgage is an asset separate from the purchase money mortgage which Mrs. Friedman received to secure an unpaid balance of the purchase price when she sold 799 Inman Avenue to the Parsons Investment Group.
[2] Because of the timing of some of the steps in the purchase and sale of 799 Inman Avenue, there were occasions when funds were required at times when Mrs. Friedman could not have had the cash available. Undoubtedly, those funds were supplied by Dr. Friedman, by application of either his cash or credit. However, plaintiff has not proved that adequate funds of Mrs. Friedman's were not available within reasonably short periods after they were needed and that they were not used to replace any of his funds.
[3] The trial court relied on the Fraudulent Conveyances Act, N.J.S.A. 25:2-1 to -6, as the basis for its rulings. Insofar as that Act was inconsistent with the Uniform Fraudulent Conveyances Law, N.J.S.A. 25:2-7 to -19, enacted in 1919, the former legislation was repealed by the latter. Trus Joist Corp. v. Treetop Assocs., Inc., 97 N.J. 22, 30, 477 A.2d 817 (1984); Conway v. Raphel, 102 N.J. Eq. 531, 533, 141 A. 804 (E. & A. 1928). The Uniform Law was repealed by the Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-20 to -34, which became effective January 1, 1989. N.J.S.A. 25:2-34; see Flood v. Caro Corp., 272 N.J. Super. 398, 640 A.2d 306 (App.Div. 1994). However, the Uniform Fraudulent Transfer Act is effective only prospectively. In re Fleet, 122 B.R. 910, 915 (E.D.Pa. 1990); In re S. Rachles, Inc., 131 B.R. 782, 788 (Bnkr.D.N.J. 1991). Insofar as material to the present suit, there do not appear to be any significant differences among these statutes.
[4] Dr. Friedman contends that the law of Florida, where he and Mrs. Friedman now reside, protects the cash surrender value of the policy even if it was fraudulently transferred. That interpretation rests on a misinterpretation of Florida law, which in this respect, is similar to New Jersey's. See In re Gefen, 35 B.R. 368, 371-72 (Bankr.S.D.Fla. 1984) (Florida statute that exempts the cash surrender value of life insurance policies and annuity contracts from creditor's reach will not shelter policies or annuities funded by money transferred to delay, hinder, or defraud a creditor); In re Total Acquisition Corp., 29 B.R. 836, 840-41 (Bankr.S.D.Fla. 1983) (Under Florida law it is not necessary to demonstrate the actual intent of the transferor to defraud its creditors to prove the existence of a fraudulent conveyance; evidence of an act or acts with the effect of defrauding creditors of the transferor is sufficient to set aside the transfer).