66 N.J. Super. 319 (1961)
169 A.2d 186
ALBERT HERMAN HAGEN, PLAINTIFF-RESPONDENT,
v.
PASCAL P. GALLERANO, ET AL., DEFENDANTS-APPELLANTS.
ALBERT HERMAN HAGEN, PLAINTIFF-RESPONDENT,
v.
GEORGE W. HAUK, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1960.
Decided March 16, 1961.
*320 Before Judges PRICE, GAULKIN and FOLEY.
Mr. Edward E. Kuebler argued the cause for the appellant Pascal P. Gallerano.
Mr. Harold M. Kain argued the cause for the appellants Maryland Casualty Company and George W. and Janet L. Hauk (Messrs. Stickel & Stickel, attorneys).
Mr. Bernard I. Kramer argued the cause for the respondent Albert Herman Hagen.
The opinion of the court was delivered by GAULKIN, J.A.D.
This case is before us for the second time. Following our previous opinion, dated December 26, *321 1958, the pleadings were completed and the cases were consolidated and pretried. We shall attempt to bring the issues into focus as briefly as possible.
On December 8, 1956 plaintiff was severely injured while crossing a street in Newark. He claims his injuries were the result of being struck by two automobiles, one owned by George W. Hauk and driven by Janet L. Hauk, and the other owned and driven by William Wenger. On November 21, 1957 he commenced a negligence suit against all these parties. The Hauks were insured by Maryland Casualty Company (Maryland), which filed an answer on their behalf denying liability and pleading a release or covenant not to sue, executed by plaintiff for $1. Since even defendants were not sure whether to characterize it as a release or a covenant not to sue, we shall call it the "paper." This paper is a printed form, originally captioned "Release." The changes in the form, and the portions we have underlined, were written by Gallerano. It reads as follows:

"RELEASE COVENANT
IN CONSIDERATION of the payment of One dollar and no 00 cents ($1.xx) Dollars to Al Hagen, 1 Pioneer St., Newark, N.J. in hand paid by Janet L. Hauk and George W. Hauk 5 Venetia, Ave, Cranford, N.J. (hereinafter called Payer(s)) I/We do covenant to hereby release and forever discharge only said Payer(s) mentioned above from any consequences of the accident hereinafter described all claims arising out of an accident occurring on or about 12/8/56, at Elizabeth Avenue, Newark, N.J. wherein the said Al Hagen sustained injuries both internal and external and lost [sic] by reason of medical expenses.
IT IS UNDERSTOOD AND AGREED that the payment of said amount by the said Payer(s) is not to be construed as an admission of liability on the part of said Payer(s), but that said payment is in compromise and settlement of my (our) claim which is not admitted but is denied and disputed by said Payer(s); that this release is being given by me (us) voluntarily and not based on any representations or statements of any kind made by the Payer(s) or his, or her, or their representative, as to the merits, legal liability, or value of my (our) claim or any other matter relating thereto.
*322 IT IS FURTHER UNDERSTOOD AND AGREED, that this release is intended to cover all actions, causes of action, claims and demands for, upon or by reason of any damage, loss or injury which may be traced either directly or indirectly to the aforesaid Payers accident, as now appearing or as may appear at any time in the future, no matter how remotely they may be related to the aforesaid Covenant accident. And this Release is executed with the full knowledge and understanding on my or our part that there may be more serious consequences, damages or injuries as the result of the accident aforementioned than now appear, and that more serious and permanent injuries, even to the extent of death, may result from the injuries sustained in accident aforementioned.
IN WITNESS WHEREOF I have hereunto set my hand(s) and seal(s) this ____ day of March 14, 1957.
 SIGNED, SEALED AND READ IN THE PRESENCE OF
 Witness /s/ Pascal Gallerano x /s/ Albert Hagen (SEAL)"
It is admitted that Gallerano was employed by Maryland, and that he procured plaintiff's signature on the paper while Hagen was in the Newark Convalescent Hospital (Maryland Medical Center) where he paid him the $1 by Maryland's draft, which Gallerano made out and signed.
Hagen filed a reply to the answer in the negligence suit, in which he alleged that his signature to the paper was procured by the fraud of Gallerano. Shortly thereafter he instituted a suit against Gallerano and Maryland for $200,000 compensatory and $5,000,000 punitive damages, for their fraud in obtaining and using the paper, making the same allegations of fraud as he made in the said reply. The pretrial order abstracts those allegations as follows:
"Plaintiff contends that * * * Gallerano * * * falsely represented to plaintiff that Gallerano was a lawyer for plaintiff; that he would see that he got a lot of money; that plaintiff had nothing to worry about since he, Gallerano, would take care of the case, investigate it; that he would see the witness, secure statements, and see the case through to its conclusion * * * Gallerano represented * * * that the instrument plaintiff was signing was merely a requisition to the hospital for cigarettes or an authorization so that plaintiff could get cigarettes." *323 Plaintiff states that his fraud action is based upon Automobile Underwriters, Inc. v. Smith, 166 N.E.2d 341 (Ind. App. Div. 1960), rehearing denied 167 N.E.2d 882 (Ind. App. Div. 1960); Ware v. State Farm Mutual Automobile Insurance Co., 181 Kan. 291, 311 P.2d 316 (Sup. Ct. 1957); Inman v. Merchants Mutual Casualty Co., 190 Misc. 720, 74 N.Y.S.2d 87 (Sup. Ct. 1947), affirmed 274 App. Div. 320, 83 N.Y.S.2d 801 (App. Div. 1948); Kordis v. Auto Owners Ins. Co., 311 Mich. 247, 18 N.W.2d 811 (Sup. Ct. 1945). But see the numerous and conflicting authorities as to the measure and proof of damages, and even the elements of the cause of action, cited in Shallenberger v. Motorists Mutual Ins. Co., 167 Ohio St. 494, 150 N.E.2d 295 (Sup. Ct. 1958) and in the annotation in 58 A.L.R.2d 500 (1958).
For reasons best known to counsel and seemingly immaterial now, the negligence action above mentioned was dismissed without prejudice by stipulation of all of the parties. However, on December 5, 1958, just before the statute of limitations would have run, plaintiff instituted a new negligence action identical with the one discontinued, and defendants filed substantially the same answers, including the defense of the paper, and plaintiff filed substantially the same reply. The last mentioned negligence action is the one that was consolidated with the fraud case, and both are now before us.
In the pretrial order Maryland and Gallerano admitted the paper was obtained for $1, but denied all of plaintiff's other allegations. In addition, Maryland said that whatever "fraud or deceit was practiced by defendant Gallerano it was ultra vires his employment, beyond scope of his employment, without consent, authority or approval of defendant Maryland and was not done or practiced as its agent or in the performance of his duties for defendant Maryland."
The trial court ordered that "the common issue of legal fraud is to be tried first with a jury. The fraud issue is *324 to be so framed as to determine the issue of agency as between the defendant Gallerano, and the defendant, Maryland Casualty Company." Pursuant to the pretrial order the issues whether the paper had been procured by Gallerano by fraud, and whether Maryland had ratified and adopted that fraud so as to make it equally responsible with Gallerano, were tried before a jury. The jury returned a verdict in favor of plaintiff on both issues and, pursuant to leave granted, defendants now appeal from that verdict.
The first ground of appeal is that defendant's motions for dismissal, and for judgment non obstante or for a new trial, should have been granted. This argument is based chiefly upon the proposition that the evidence was not sufficient to prove fraud. On the contrary, we find it difficult to conceive how the jury could have come to any other conclusion. As the court said in Atchison, T. & S.F. Ry. Co. v. Cunningham, 59 Kan. 722, 727, 54 P. 1055, 1057 (Sup. Ct. 1898) in referring to a similar situation:
"Where such unseemly haste is made in obtaining settlements with parties who have sustained such serious injuries, and where the amount paid is so trifling, and utterly disproportionate to any just compensation, it seems like wasting time to nicely discuss questions of evidence bearing on the plaintiff's capacity to transact business. Taking the testimony offered by the defendant in its most favorable aspect, the settlement was made at such a time, under such conditions, and on such terms as to condemn it as a fraud and imposition."
However, we shall review the evidence.
Hagen was a widower, about 60 years old, with a sixth grade education, earning $40 to $50 per week as an automobile body painter. Gallerano was a law school graduate, although not a lawyer, and had been employed by Maryland as an adjuster for over seven years.
On January 14, 1957 Gallerano came, uninvited, to see Hagen in the hospital. Hagen was not represented by counsel. Hagen was in a cast and in pain. He testified that Gallerano said he "was my lawyer. He said he was *325 going to get me a lot of money," and left his card. Gallerano admitted that he told Hagen that he was going to make a further investigation of the case and would notify Hagen of the results.
Gallerano learned, during the January 14 interview, that Hagen knew little, if anything, of how the accident happened. In the very statement which Gallerano had Hagen sign that day Hagen said he saw a car approaching, the color and make of which he did not know, "and before I knew what happen [sic] I was struck by it, it happen [sic] so fast I don't remember what part of his car hit and I do not remember being thrown against any other passing car." He awoke in the hospital in pain, with a broken leg and other injuries. He did not know who owned or drove either car. We note that Wenger's answer in the negligence action alleges, as a separate defense, that "The accident, if any, in which the plaintiff was involved occurred prior to the time that defendant, William Wenger, arrived at the scene and defendant, William Wenger, denies that there was any contact between his automobile and the plaintiff at any time."
On or about February 18, not having heard from Gallerano, Hagen wrote him a letter saying that he had been moved to the Convalescent Hospital and:
"I would like to hear from you I would like to how things is getting a long.
Hoping to hear from you soon I would like to talk to you.
 Your Tuly
 Mr. Albert Hagen.
 Please write or come up to see me."
The above is reproduced exactly as it was written. It is stamped "received Feb. 18, 1957. Newark Claim Division [of Maryland]." There was also marked in evidence an envelope addressed to Gallerano, with Mr. Hagen's return address, on the assumption that it had contained the above quoted letter. However, the envelope is postmarked March 4, *326 1957. It may be that it contained a further communication from Hagen, for apparently Gallerano did not respond until March 14.
In any event, on that date Gallerano called upon Hagen for the second time. He was still in a cast. Defendants admit that it was on this occasion that Hagen signed the paper and received the $1. Hagen testified:
"Q. What did Mr. Gallerano say when you saw him the second time? A. `How do you feel?'
Q. What did you say? A. I said, `Not so hot.'
Q. Then what did he say? A. He said, `What do you need?'
I said, `I'd like to have something to smoke.'
Then he had a paper. He came out with a paper. He said, `This is for the cigars. Sign this paper.'"
Gallerano admitted that he did not give Hagen a copy of the paper. Hagen testified that after he signed Gallerano gave him the $1 draft; that, after a conversation with a fellow patient about it, he never cashed it.
Defendants' own witnesses acknowledged that in all their years of experience they had never before known of an injured claimant giving up all his rights for $1; but defendants argue that Hagen did so understandingly because he knew that the Hauks were not liable. Defendants do not contend that he had any source of knowledge other than what Gallerano told him. Gallerano testified that on his first visit to Hagen this was the conversation:
"I said, `Mr. Hagen, I am here to see you in regard to your automobile accident you had in January  December rather  8.'
I said, `Do you recall it?'
He said, `Yes.'
I said, `Well, I represent Mr. and Mrs. George Hauk. They are insured with the Maryland Casualty Company.'
I said, `We received a report from our insured, Mr. and Mrs. Hauk, wherein they stated that they were traveling, driving their automobile, rather, in one direction on Elizabeth Avenue, and a car coming in the opposite direction struck you and threw you against the rear of their car.'
I said, `I also have a statement from Janet Hauk  she was the wife of Mr. Hauk, and she was a passenger in the car  and she substantiates that.'
*327 I said, `Furthermore, while Mr. Hauk was speaking with the police at the scene of the accident, he advises us that a woman witness approached the officer and himself and said that you were struck by a hit-and-run car. She gave the police the license number of this hit-and-run car.' I said, `that number appears on the police record.'
Mr. Hagen said, `Well,' he said, `I know I was struck.' He said, `I would like to get something out of this.'
I said, `That is my position. I don't feel that the people I represent contributed to your injury or are responsible to you or liable in any way.'
I said, `Would you care to give me a statement as to the facts as you recall them, remember them?'
He said, `Sure, all right.'
Q. Did he give you a statement? A. Yes, he did.

* * * * * * * *
Q. After you obtained a statement from Mr. Hagen, did you have any further conversation with him? A. I restated our position again after having read his statement. I said, `It seems quite clear that the people I represent, Mr. and Mrs. Hauk, were not responsible or liable in any way in this accident. They didn't contribute to your injuries.'
He said, `Well, I guess that's it.'
I said, `I am attempting to locate this woman witness,' and I also told him that, `I have written to the State Motor Vehicle Department, and they furnished me with the name of the owner of the hit-and-run car.' With that I said, `If anything comes up I'll let you know.'
With that I took my leave."
He testified that on March 14:
"* * * A. I approached Mr. Hagen and said, `How do you do, Mr. Hagen?' I said, `How are you feeling?'
He said, `Fine.'
I said, `I received your letter, I am here in response to it. What do you want?'
He said, `As I wrote you, I would like to know what is happening on the case.'
I said, `My position has not changed since I saw you in January. As I explained at that time, I felt our insured, Mr. and Mrs. Hauk, were not liable for your accident.' I said, `In fact, since I have seen you I have talked to our insured, George Hauk, and he corroborates most of the information I told you.' I said, `It still appears that you were struck by a hit-and-run car and thrown against the rear of our car.'
He said, `Well, I guess that's it.'
*328 I said, `If you feel now that Mr. and Mrs. Hauk were not liable or responsible for this accident, will you release them from this accident?'
He said, `Yes, sure.'
So with that I reached into my brief case, and I couldn't find a covenant not to sue among the forms I carry with me. I did have a release. So I made certain changes on the release form so that it would have the same import as a covenant not to sue, that it would merely release the Hauks, Mr. and Mrs. Hauk.

* * * * * * * *
Q. Can you tell us whether or not you presented that paper to Mr. Hagen to read before he signed it? A. I absolutely did, yes. I told him, `Mr. Hagen, I have prepared a form here which is called a covenant not to sue, and it means that you are merely agreeing to release the people that I insure, George Hauk, whose name appears on the form.' I said, `Will you read it over, please? If you want any changes, if you don't understand anything about it, feel free to tell me.'
Mr. Hagen took it and he read it, and he said, `it's all right,' and he signed it, and I signed my name to it."
On cross-examination he testified:
"Q. As I understand your testimony, sir, it is that you explained to Mr. Hagen that your assured, the Hauks, in no way contributed to his injuries, and you gave him other information about the happening of the accident, and on the basis of these things he was convinced that he had no claim against your people, and he signed this document for a dollar? A. That is correct."
Defendants argue that this was a mere honest expression of opinion by Gallerano.
Gallerano admitted he knew the paper might "cut any possible verdict he might get against the other driver by one-half under the law of New Jersey," and that he did not tell this to Hagen but on the contrary told him he was not releasing his rights against Wenger; but defendants argue that this was "an opinion on the law * * * on which the party to whom it is made has no right to rely."
Throughout defendants' arguments runs the theme that even if some of the things Gallerano said or failed to say might be evidence of "equitable" fraud, they did not constitute "legal" fraud. As Justice (then Judge) Jacobs said *329 in Heuter v. Coastal Air Lines, Inc., 12 N.J. Super. 490, 495 (App. Div. 1951):
"We reject this contention because of our view that, even assuming the agents refrained from making any affirmative misstatement, their conduct, upon the present showing, was nevertheless such as to warrant submission to the jury of the issue as to whether there had been `imposition practiced upon the signer with intent to deceive him as to the purport of the paper signed.' Evangelista v. Public Service Coordinated Transp. * * * [7 N.J. Super. 164 (App. Div. 1950)]. Willful silence where, as here, the circumstances gave rise to a clear duty to speak and explain may not be differentiated from willful misstatement. See Restatement, Contracts, §§ 471, 472 (1932); 23 Am. Jur. p. 854 (1939). Furthermore, as we have already indicated, the plaintiff was not confined to a sufficient showing at law as the defendant suggests. To avoid the release he could properly rely upon the evidence of his illiteracy, his illness, the absence of friends and counsel, his lack of understanding and the omission of all explanation, the haste, pressure and somewhat startling circumstances surrounding the procurement of his mark, and invoke pertinent equitable principles based upon unfair and unconscionable conduct of the defendant. Dundee Chemical Works v. Connor * * * [46 N.J. Eq. 576 (E. & A. 1890)]; McGrail v. Jersey Central Traction Co. * * * [84 N.J. Eq. 261 (Ch. 1915)]."
In Scott v. Bodnar, 52 N.J. Super. 439 (App. Div. 1958), certification denied 29 N.J. 136 (1959), we held fraudulent another release, under circumstances similar to those here. See also 45 Am. Jur., Release, § 21; Annotations: 21 A.L.R.2d 272, 276 (1952); 164 A.L.R. 402, 410 (1946); 96 A.L.R. 1001 (1935).
As the court said in Heuter, supra, 12 N.J. Super., at p. 493, "There has been considerable litigation with respect to the validity of releases from accident claims and an increasing awareness of the broad policy supporting a suggested requirement that they be fairly obtained." Cases such as the one at bar have caused agitation for legislation to curtail the right of insurance companies to take releases and statements from claimants in hospitals. 1 Stan. L. Rev. 298 (1949). In some states such legislation has been adopted. See, for example, Maine, Revised Statutes, "Crimes against Public Health, Safety and Policy," c. 137, *330 § 49-A; Maryland, Annotated Code, Art. 79, § 11; Mass., General Laws Annotated, "Crimes and Punishments," c. 271, § 44; New York, McKinney's Consolidated Statutes, c. 40, "Penal Law," § 270-b.
In Bearor v. Kapple, Sup., 24 N.Y.S.2d 655, at p. 658 (Sup. Ct. 1940), the court said that the New York statute was enacted "to the end that the injured person might die in peace or recover without being harassed, exploited, victimized and molested. * * *."
Gallerano may have been illegally practicing law. See 5 Am. Jur., Attorneys At Law, § 3, p. 263, Cum. Supp., p. 28; Liberty Mutual Ins. Co. v. Jones, 344 Mo. 932, 130 S.W.2d 945, 125 A.L.R. 1149, 1171 (Sup. Ct. 1939). We pass that question, since the answer to it is not necessary for the disposition of this case. However, having undertaken to advise Hagen as to the meaning of the paper, it was Gallerano's obligation to advise him fully and, among other things, to tell him that the paper might bar or reduce his claim even against Wenger. In this connection it is worthy of note that, even according to Gallerano's testimony, the paper falsely recites "that this release is being given * * * voluntarily and not based on any representations or statements of any kind * * * as to the merits, legal liability, or value of my * * * claim or any other matter relating thereto." Gallerano testified:
"Q. * * * Did you ever tell him about the value of his claim as it pertained to your assured? A. That he had no claim at all.

* * * * * * * *
Q. You told him he had no claim? A. When I gave him the dollar draft, I told him, `It bears no relationship to your injuries. It is the practice to give this dollar in consideration of your signing that form.'
Q. Did you tell him he had no claim against your assured or words to that effect? A. Yes, words to that effect, yes."
Maryland contends that the evidence was insufficient to prove it ratified Gallerano's fraud by adopting its fruits. *331 But here, too, we find it difficult to comprehend how the jury could have decided otherwise than it did. As we have seen, Maryland pleaded the release not once, but twice. The second time was after Maryland had complete knowledge of the facts. Hagen's and Gallerano's depositions had been taken; the alleged fraud had been fully discussed in the briefs and during the oral argument in the former appeal; and our previous opinion expressed our astonishment at the transaction and our doubt that Maryland would plead the paper again. Yet, thereafter, Maryland did so. If Maryland knew or should have known of the fraud, this tenacious grip upon its fruits made it equally liable with Gallerano. Ware v. State Farm Mutual Automobile Insurance Co., supra; cf. Hardware Mutual Casualty Co. v. Lieberman, 39 F. Supp. 243 (D.C.N.J. 1941).
The jury had the right to conclude that Maryland knew or should have known of the fraud. Gallerano's superiors were seasoned and sophisticated insurance men, thoroughly familiar with the work of insurance adjusters and of the obligations they owe to claimants. Maryland argues that it had the right to believe its agent Gallerano. That may be true as to some of plaintiff's allegations as, for example, that Gallerano said the paper was a requisition for smokes. However, most of the evidence could not be denied  the time, the place, the haste, the consideration; Hagen's age, disability, lack of education, intellect and knowledge of the accident; the complex language of the paper; Gallerano's superior education, intelligence and experience; Hagen's lack of representation; and Gallerano's downright misrepresentation to Hagen that the paper would not affect his claim against Wenger. One of Gallerano's superiors testified that in his ten years' experience he had never seen a $1 release. Maryland's executives knew that Hagen's injuries were serious; that Gallerano had delivered to Maryland an extraordinary plum; that to avoid delay (which might give Hagen time to seek advice, or come to his senses), Gallerano had violated company instructions not to witness claimants' signatures *332 and not to alter release forms. The claims manager of Maryland admitted that he was consulted only in cases involving $3,500, or those presenting an unusual problem; that he had been consulted in this particular case before the paper was procured; and that he had seen the paper afterward and noted that it had been altered and witnessed contrary to company rules.
In short, the verdict against Maryland and Gallerano was amply supported by the evidence.
The trial court instructed the jury as to the "five essential elements of fraud," namely, false representations, known to be false, intending that plaintiff act thereon, action in reliance thereon, and resulting damage to the plaintiff. As to the fifth, the judge said:
"I charged you during the course of my charge that one of the essential elements in this case was damages. If you find that the plaintiff proved all the other essential elements in the case, it follows and I so charge you that the plaintiff was damaged. In other words, if false representations were made as to present or past material facts, if the defendant knew them to be false when he made them, if he made them with the intent that the plaintiff should act thereon, and if the plaintiff did act in reliance thereon, then you will find that there was damage, and you need not concern yourself with the amount of the damage in this case."
Defendants contend that this was error  that the court should have left to the jury the question whether plaintiff had been damaged, with instruction to find for defendants unless it found that plaintiff had been actually damaged. That is not so. The very assertion of the fraudulently procured paper as a defense caused plaintiff damage. Cf. Winkler v. Hartford Accident & Indemnity Co., 66 N.J. Super. 22 (App. Div. 1961); Racanati v. Black Diamond Stevedoring Co., Inc., 132 N.J.L. 250, 251, 253 (E. & A. 1944). In our previous opinion we indicated our uncertainty as to what compensatory damages plaintiff could prove in the fraud case "until it is determined what, if anything, he recovers on his primary cause of action for negligence." Cf. Racanati v. Black Diamond Stevedoring *333 Co., Inc., supra. That question was not before us for resolution then, nor is it now, and we express no opinion on it, except to say that the reasonable expense of the litigation to establish the invalidity of the release is an item that is recoverable in the fraud case. Feldmesser v. Lemberger, 101 N.J.L. 184, 41 A.L.R. 1153 (E. & A. 1925); Racanati v. Black Diamond Stevedoring Co., Inc., supra.
Furthermore, pursuant to R.R. 4:43-2(b), and the pretrial order, the trial court ruled that the question of damages was to be tried separately. The effect of the verdict appealed from, on the negligence action, is to eliminate the paper as a defense. In the fraud action the verdict establishes that the paper was obtained fraudulently, and that Gallerano and Maryland are responsible in damages for the fraud, the amount of which is to be established.
The directions given by the trial judge, charting the future course of the litigation, are not before us for review, although they were mentioned during the oral argument, and counsel appeared to disagree as to what the trial court meant. However, that question, like the related question of the items and the measure of damages in the fraud action, was not briefed or argued, and therefore we express no opinion thereon. We leave all questions not fully resolved in this opinion to the trial court.
We have examined the other grounds of appeal and find them without merit. They do not require discussion.
The appeal is dismissed, with costs.