REMINGTON RAND CORPORATION, By Change of Name, The Kilbarr Corporation, Plaintiff–Appellee,

v.

AMSTERDAM–ROTTERDAM BANK, N.V., Pierson, Heldring & Pierson, N.V., Defendants–Appellants,

Business Systems Incorporated International N.V., also known as BSI, N.V., et al., Defendants.

No. 672, Docket 94–7519.

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1994.

Decided Oct. 23, 1995.

John L. Warden, New York City (Joseph E. Neuhaus, Sullivan & Cromwell; Arlin M. Adams, Schnader, Harrison, Segal & Lewis, Paul J. Curran, Gregory J. Wallance, Kaye, Scholer, et al., of counsel), for Defendants–Appellants.

James C. McConnon, Philadelphia, Pa., (Paul & Paul; J. Portis Hicks, Boulanger, Hicks, et al., New York City; Lewis H. Van Dusen, Jr., Drinker Biddle & Reath, Philadelphia, Pa., of counsel), for Plaintiff–Appellee.

Henry L. King, Karen E. Wagner, Douglas M. Fuchs, Davis Polk & Wardwell, New York City (On the Brief), for Amici Curiae The New York Clearing House Association and The Institute of International Bankers.

John R. Hupper, Cravath, Swaine & Moore, New York City (On the Brief), for Amicus Curiae Government of the Kingdom of The Netherlands.

Before: VAN GRAAFEILAND, MINER, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

This is an appeal from a judgment in favor of plaintiff Remington Rand Corporation (now The Kilbarr Corporation) ("Remington") awarding damages exceeding $339 million against two Dutch banks (the "Banks"), Amsterdam–Rotterdam Bank, N.V. ("AMRO") and Pierson, Heldring & Pierson, N.V. ("Pierson"). In prior litigation in the United States District Court for New Jersey, Remington obtained a judgment of $221,409,-481 against Business Systems Inc., International N.V. ("BSI"), for misappropriation of trade secrets. *See Remington Rand Corp. v. Business Sys., Inc.,* 830 F.2d 1260 (3d Cir. 1987), *on remand, Kilbarr Corp. v. Business Sys. Inc.,* 679 F.Supp. 422 (D.N.J.1988), *aff'd,* 869 F.2d 589 (3d Cir.1989). BSI's insolvency, however, prevented Remington from collecting the judgment. In this action, Remington asserted that the Banks were responsible for BSI's misappropriation and liable on the prior judgment against BSI by virtue of their complicity in the misappropriation and their control over BSI's defense of the New Jersey litigation. The jury found for Remington on both these issues. It rejected the claim of the Banks that they were protected by releases executed by Remington, finding that the releases were fraudulently induced. Relying on the doctrine of collateral estoppel, the district court held the Banks liable for the damages previously found in Remington's suit against BSI, barring the Banks from contesting the amount of Remington's damages. Judgment was entered for those damages, plus interest of almost $118 million, for a total of $339,282,205.94.

The Banks' two principal contentions on appeal are that the district court erred in failing to give effect to the releases executed in their favor by Remington, and that the court erred in precluding the Banks from contesting the amount of Remington's dam-

ages. We agree. Accordingly, we vacate the judgment and remand for further proceedings.

## I. *Background*

### A. *The Misappropriation of Remington's Trade Secrets*

This litigation focuses on the transfer and use of proprietary technology for the production of the SR–101, an electronic typewriter similar to the IBM Selectric golfball typewriter. In 1978, Remington acquired the proprietary technology for producing the SR–101 from Sperry Corporation. In 1979, Remington licensed this technology to its Dutch manufacturing subsidiary, Remington Rand B.V. ("Remington B.V."). The licensing agreement required Remington B.V. to pay Remington a royalty of approximately $50 per typewriter for, among other things, the use of the technology. The licensing agreement also contained a confidentiality clause that required Remington B.V. to treat all information "with reasonable confidence" and to prevent disclosures to third parties.

The contracts between Remington and Remington B.V. provided that Remington B.V. would manufacture the SR–101 and supply Remington with typewriters for sale in the United States. To provide working capital for this venture, Remington B.V. obtained loans of $10 million from the Banks, secured by liens on Remington B.V.'s assets.

Both Remington and Remington B.V. soon began experiencing financial difficulty. By the end of March, 1981, Remington sought bankruptcy protection under Chapter 11 of the U.S. bankruptcy code, 11 U.S.C. §§ 1101–1174, while Remington B.V. had defaulted on its loans and entered "suspension of payments" proceedings in The Netherlands under the Dutch insolvency laws. Remington B.V. was declared bankrupt on May 26, 1981. Its assets, including the technology licensed from Remington, were subsequently sold by the Dutch bankruptcy trustees (the "Trustees") to BSI, which had been formed by a group of Middle Eastern investors (the "Investors") to acquire Remington B.V.'s business with financing provided in part by the Banks.

Remington contends that the sale of Remington B.V. was the result of a conspiracy formed on May 11, 1981 (after Remington B.V. had entered suspension of payments) between the Banks, the Trustees and the Investors to misappropriate Remington's typewriter technology. Remington claims that the conspirators plotted to distract it by an insincere proposal to buy Remington's stock while they put Remington B.V. into bankruptcy and arranged to sell its assets to BSI. With this objective, the Trustees sent an ultimatum to Remington on May 12, 1981, demanding that the shares of Remington itself be sold to the Investors by May 20, 1981, failing which Remington B.V. would be forced into bankruptcy on that date. Remington sought to negotiate this demand with the Investors, but the Investors, who never intended to purchase Remington, refused and secretly pursued independent negotiations with the Trustees to acquire Remington B.V. On May 19, 1981, Remington sent a telex to the Trustees and the Banks stating its willingness to negotiate a sale of Remington. This forestalled the bankruptcy of Remington B.V.

Meanwhile, negotiations for the sale of Remington B.V. continued between the Banks, the Trustees, and the Investors. On May 25, 1981, the Investors tendered an offer to the Trustees. The next day, May 26, 1981, upon the petition of the Trustees, Remington B.V. was declared bankrupt. That same day, the Trustees asked the Dutch bankruptcy judge overseeing the Remington B.V. proceedings for permission to conduct a private sale. Remington learned of these developments on May 27 through its Dutch counsel, Allard Voute, who read of the bankruptcy and impending sale in the newspapers. Voute sought confirmation of the proposed sale from a Mr. Jonckheer, a bank officer at Pierson. According to a memorandum prepared by Voute, Jonckheer said that there were ongoing discussions taking place between the Trustees and the Investors, and that the Banks were aware that a private sale could be complicated by the licensing agreement.

On June 1, 1981, the Dutch bankruptcy judge approved the sale. The Dutch judge's

approval was based in part on the Trustees' representations that a sale of Remington itself was impossible. As proof of this, the Trustees had submitted the May 12 ultimatum without revealing the existence of Remington's May 19 reply. On June 4, 1981, the Trustees sold Remington B.V.'s assets to the newly created BSI. The bankruptcy and sale were both conducted without prior notice to Remington. The sale had the effect of transferring and disclosing the SR–101 know-how to BSI. Approximately $8 million, or 90%, of the sale proceeds went to the Banks as payment for loans extended to Remington B.V. The Banks subsequently entered into new loan agreements with BSI.

Remington had no product source following the sale of Remington B.V.'s manufacturing assets to BSI. BSI, on the other hand, began efforts to develop a distribution network in the United States independent of Remington.

## B. *The New Jersey Litigation*

At first, Remington negotiated with BSI to receive BSI's typewriters for sale in the United States. In August 1981, after these negotiations failed, Remington filed suit against BSI in the United States bankruptcy court for the District of New Jersey. Remington accused BSI of trademark infringement and misappropriation of trade secrets. Remington sought a preliminary injunction preventing BSI from selling typewriters in the United States.

During discovery, Remington began articulating suspicions about the Banks's involvement in BSI's affairs. In December of 1981, Remington's president asserted under oath that Remington's efforts to secure a typewriter supply from Remington B.V. in April of 1981 had been defeated by interference from the Investors, with "either the cooperation of or the support of or the trickery and deceit of the Dutch banks." Later, in April of 1982, Remington's counsel claimed that the Banks, the Investors, and the Trustees had worked together to frustrate Remington's efforts to maintain an ongoing relationship with its Dutch subsidiary.

While the motion for a preliminary injunction was pending, Remington continued its efforts to emerge from Chapter 11. In order to devise a reorganization plan, Remington sought to resolve disputes with Remington B.V. and the Banks over uncollected accounts receivable. Remington, the Banks, and Remington B.V. had asserted competing claims to certain accounts receivable arising from Remington B.V.'s sales prior to its entrance into suspension of payments. The parties resolved this dispute in a Stipulation and Order approved by the bankruptcy court. Under the terms of the settlement, the Banks assigned their claims to Remington B.V., which in turn assigned its claims to Remington. In total, Remington obtained exclusive rights to approximately $2 million in accounts receivable. In return, Remington made a $400,000 payment to Remington B.V. and issued a general release to the Banks and others.

The release stated:

> In consideration of a release received from the Dutch banks ... the debtors [including Remington] release and discharge the Dutch banks, their successors and assigns from all claims and causes of action whatsoever, which the debtors, their successors and assigns ever had, now have, or hereafter may have against the Dutch banks by reason of any matter whatsoever from the beginning of time to the effective date of this Stipulation and Order.

The terms of the Stipulation and Order became effective when the bankruptcy judge approved the order on April 23, 1982.

In the following months, Remington continued to deal with the Banks in unrelated matters and to collect the accounts receivable assigned to it. On September 8, 1982, Remington and the Banks again exchanged general releases. The release signed by Remington was almost identical to the one previously given. In it, Remington released the Banks from "all claims and causes of action whatsoever" that Remington "ever had, now have, or hereafter may have against the Banks by reason of any matter whatsoever from the beginning of time to the date of this

release." [1]

Remington ultimately prevailed on its claims against BSI for trademark infringement and misappropriation of trade secrets. In September 1984, the New Jersey district court issued an opinion finding that BSI acquired Remington B.V.'s assets with notice of Remington's protected interest in the SR–101 technology but without giving notice to Remington that the technology was included in the sale. The court further concluded that while Dutch law permitted the Trustees to transfer Remington B.V.'s assets, it also required the Trustees to protect Remington's interests by providing some mechanism for compensation. The court imposed liability on BSI for using the SR–101 technology without compensating Remington.

The court held a separate trial to determine damages. Before the trial, however, BSI entered suspension of payments proceedings in The Netherlands and was declared bankrupt. The trial on damages proceeded in April 1985. BSI presented no witnesses and offered only one exhibit. Relying on essentially unrebutted proofs offered by Remington, the district court awarded damages based on: (1) $4,950,000 for injury to the value of Remington's trademark; (2) approximately $38 million in lost royalty payments; and (3) Remington's estimate of its lost profits from lost sales of machines, parts, and supplies for the time that it would take Remington to develop an alternate source of supply. As to the third element of damages, Remington asserted it would have made $209.67 per machine on sales of 100,000 machines per year for eight years. This produced a judgment of $221,409,481 against BSI. The judgment was uncollectible by virtue of BSI's bankruptcy.

## C. *Proceedings Below*

Remington then brought this action against the Banks, initially in the District of New Jersey, then transferred to the Southern District of New York, charging them with participation in BSI's misappropriation and continued use of Remington's trade secrets, and seeking to hold the Banks liable for the judgment Remington had won against BSI.

Remington contended that the Banks were liable for the judgment against BSI because: (1) the Banks participated in a conspiracy with the Trustees and the Investors to misappropriate and use Remington's trade secrets; (2) BSI adequately represented the interests of the Banks in the New Jersey litigation; and (3) the Banks participated in the control of the New Jersey litigation directly and through their control of BSI.

The Banks denied knowledge of or participation in any wrongful conduct of BSI and the Trustees. They also claimed that they did not control BSI in the prior litigation, and did not determine trial strategy, select witnesses, or decide what evidence or legal arguments would be presented. Furthermore, the Banks argued that Remington's suit was barred by the releases. Remington countered that the releases were unenforceable because the Banks had fraudulently procured them by concealing the Banks' participation in the conspiracy. The Banks denied the allegation of fraud, contending that their participation in BSI's purchase was limited to a proper banking relationship, of which Remington was aware.

The jury returned a special verdict in favor of Remington. The special verdict contained findings that the Banks had conspired with others to acquire and operate Remington B.V.'s business by "fraud, trickery and deceit," and that the Banks had fraudulently concealed material facts to induce Remington to sign the releases.

On the issue of damages, the jury found that the Banks were liable for the damages awarded by the New Jersey court against BSI because they substantially participated

---

1. The parties dispute the effective date of the September 8 release. The Banks contend the new release was intended to ensure that neither party could assert claims against the other for conduct occurring between April 23 and September 8, 1982. Thus, they contend the effective date of the September 8 release was September

8. Remington claims that the September 8 release was designed to cure a technical deficiency of the April 23 release, and not to extend the time of released activity. We have no reason to rule on this dispute. It may, however, be relevant to the issues remaining for the district court on remand.

in the control of BSI's earlier litigation. The district court entered judgment against the Banks in the amount of Remington's judgment against BSI, plus approximately $118 million in interest, producing an aggregate judgment of $339,282,205.94. This appeal followed.

## II. *Discussion*

### A. *The Releases*

The Banks contend that the releases signed by Remington in 1982 bar Remington's claims in this action. Those releases, as noted above, commit Remington to relinquish "all claims and causes of action whatsoever, which [Remington] ... ever had, now [has], or hereafter may have against the Banks by reason of any matter whatsoever from the beginning of time to the date of this release." On their face, the releases would appear to preclude any claims against the Banks arising from conduct prior to their execution.

Remington does not dispute that the releases, if valid, would bar all claims arising before their effective dates. Rather, it seeks to avoid the releases on grounds that the they were procured by fraud. Remington contends that the Banks fraudulently concealed their relationship with BSI and their participation in the wrongful transfer of Remington's proprietary technology to BSI in order to induce Remington to sign the releases. Remington relies on the following alleged misrepresentations by the Banks: According to a memo written by Voute, Remington's Dutch lawyer, Jonckheer, a bank officer, told Voute on May 27, 1981, that "there are presently discussions taking place between the receiver ... and the Arab group." Remington claims that Jonckheer's statement, as reported in this memo, was misleading because it failed to disclose that the Banks were participants in the discussions, and failed to reveal that the Arab group (meaning the Investors) had already made an offer. Second, the Banks failed to disclose that it was they who drafted the

"ultimatum" telex of May 12, 1981, sent by the Trustees, which threatened bankruptcy unless Remington was sold to the Investors. Third, the Banks did not reveal that a bank officer listened secretly via intercom to a conversation between BSI officers and the president of Remington on July 8, 1981.

 We conclude that this evidence is legally insufficient to void the releases. First, a concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose. *See Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 47 (2d Cir.1993) (under New York law, fraud based on omissions of material fact requires showing duty to disclose); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984) (same); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1185 (3d Cir.1993) (under New Jersey law, fraudulent concealment requires proof of duty to disclose) (citing *Viviano v. CBS, Inc.,* 251 N.J.Super. 113, 122, 597 A.2d 543, 548 (App.Div.1991)).[2] Such a duty ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust. *Aaron Ferer,* 731 F.2d at 123; *Lightning Lube,* 4 F.3d at 1185.

There was no fiduciary or other relationship of trust between Remington and the Banks at the time the releases were executed. In fact, their postures were adversarial—both were asserting competing claims to the accounts receivable. Their relationship had been that of lender and borrower; absent special circumstances, a lender does not incur fiduciary obligations toward its debtor. *Cf. Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150–51 (2d Cir.1993) (reciting examples of fiduciary and other informal relationships of trust); *see also Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1315 (5th Cir.1983) ("Parties bargaining at arms length who are not in a fiduciary relationship with one another are not re-

**2.** The Banks claim that the district court erroneously applied New York law on fraudulent concealment, and that the releases are governed by New Jersey law; Remington asserts that the Banks waived this objection. It is not clear from the record whether the district court based its instructions on New York or New Jersey law. In any event, we need not resolve this dispute because the releases are valid under either New York or New Jersey law.

quired to make known all possible claims against one another.").

In the absence of a fiduciary relationship, a duty to disclose may arise if: (1) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party, *see Brass,* 987 F.2d at 150; *Lightning Lube,* 4 F.3d at 1185; or (2) "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer,* 731 F.2d at 123. In either case, a disclosure duty ripens only when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of a material fact. *See* Restatement (Second) of Torts § 551 cmt. k (1977) (no liability for nondisclosure where defendant has no reason to believe plaintiff is acting under a misapprehension).

There was no showing that Remington signed the releases while laboring under mistaken assumptions about the Banks' involvement in BSI's acquisition of Remington B.V. Remington was well aware there was a close relationship between the Banks and BSI. Before signing the releases, Remington had taken deposition testimony in the original litigation against BSI that described several meetings between the Banks, the Investors, and the Trustees prior to the BSI sale. Remington's president testified that in early 1982 he reviewed the purchase agreement, which identified the Banks as sellers and showed that the Banks helped finance the takeover. The purchase agreement also revealed that approximately 90% of the sale proceeds went to the Banks. Further testimony obtained by Remington before its execution of the releases showed that the Banks had extended approximately $6 million in credit to help BSI begin operations. Remington was fully aware that the Banks were closely involved in the BSI acquisition. The scant additional information Remington claims the Banks concealed from it conveyed nothing substantial or material that would have influenced Remington in its execution of the releases.

Remington has thus failed to show that the Banks were aware that it had a false understanding of their role in the sale of BSI. In sum, Remington has failed to show any basis for a duty on the part of the Banks to tell Remington the facts that the Banks allegedly concealed. *See Aaron Ferer,* 731 F.2d at 124 (no fraud where plaintiff represented by counsel in arm's length negotiations, knew the general nature of possible claims, and knew what was being given up in release).

Second, there is no evidence that the Banks intended by the allegedly fraudulent concealment to induce Remington to sign the releases. *See First Nationwide Bank v. 965 Amsterdam, Inc.,* 212 A.D.2d 469, 623 N.Y.S.2d 200, 201 (1st Dep't 1995) (fraud requires showing intent to induce reliance); *SL Industries, Inc. v. American Motorists Ins. Co.,* 128 N.J. 188, 607 A.2d 1266, 1277 (1992) (same). Jonckheer's statement that there were "discussions" taking place between the Trustees and the Investors, without disclosing the degree of the Banks' participation, was made on May 27, 1981, nearly a year before the releases were contemplated, and long before negotiation of the agreement that gave rise to the releases. It is inconceivable that the statement was made with the intent to induce the releases. The same is true of the Banks' "failure to disclose" both that a Bank officer listened to a telephone conversation between BSI and Remington on July 8, 1981, and that it was the Banks who drafted the ultimatum telex of May 12, 1981.

Finally, on entering into the releases long thereafter, Remington could not reasonably have relied on the allegedly misleading concealment. *See Ambassador Factors v. Kandel & Co.,* 626 N.Y.S.2d 803, 805 (App.Div., 1st Dep't 1995) (claim of fraud requires showing of reasonable reliance); *Jugan v. Friedman,* 275 N.J.Super. 556, 646 A.2d 1112, 1119 (Ct.App.Div.1994) (fraud requires reliance on misrepresentation). As of April 23, 1982, and September 8, 1982, the dates when the releases were signed, it was of no importance whether, as of May 27, 1981, BSI had made an offer. Remington knew that subsequently a sale agreement had been reached. Nothing turned on the state of the negotiations on May 27, 1981. Nor did it matter to what degree, as of May 27, the

Banks had involved themselves in BSI's acquisition of Remington B.V. Even if the Banks' involvement had been small as of that date, Remington was well aware from discovery conducted in the New Jersey litigation that the Banks' subsequent involvement was far more extensive. It therefore could not have signed the release in the mistaken belief that the Banks had no involvement in BSI's acquisition and use of Remington's technology.

Because we find insufficient evidence as a matter of law to support Remington's claim of fraudulent concealment, we hold that the releases were valid and barred all claims by Remington against the Banks based on conduct occurring before the effective date of the September 8, 1982 release. This conclusion requires us to vacate the entire judgment below.[3]

■ The Banks urge us to go further; they contend that the releases require dismissal of the entire action. We disagree. The Banks' position presupposes that the Banks committed no acts subsequent to the releases upon which their liability could be predicated. Remington contends the Banks acted in complicity with BSI in a continuing wrongful use of Remington's trade secrets from June 1981 to the time of the complaint. Although the releases shield the Banks from liability for any conduct through their effective dates, they do not protect the Banks from liability arising from any subsequent wrongful conduct. We must therefore remand for further proceedings, to be determined either by summary judgment or trial, to establish whether, after their release, the Banks committed any wrongful acts upon which liability could be based.

B. *Proceedings on Remand*

■ The question nonetheless remains whether, in the event the Banks are held liable on remand for conduct subsequent to the releases, the district court should preclude them from contesting post-release damages found against BSI in the New Jersey trial. We conclude that the Banks

should be permitted to contest Remington's damages in the event they are found liable for post-release conduct.

The district court instructed the jury that it could hold the Banks liable for the damages found against BSI in the New Jersey action if it found that the Banks participated in the misappropriation and controlled BSI's defense in the New Jersey litigation. The jury so found and awarded against the Banks the damages previously awarded against BSI. The Banks challenge this application of collateral estoppel on several grounds. Their primary contentions are that: (1) applying collateral estoppel was unfair because BSI had no incentive to contest the determination of damages in the New Jersey litigation; (2) the jury instructions regarding the degree of control necessary to bind the Banks were erroneous and prejudicial; and (3) the evidence was legally insufficient to support a finding of control. We find it unnecessary to address the Banks' claims with regard to the second and third issues relating to control because we find it was fundamentally unfair to bar them from contesting the amount of Remington's damages by enforcing against them the damages finding made in the New Jersey litigation against BSI.

■ Under the doctrine of collateral estoppel, also known as issue preclusion, " 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.' " *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980)). Collateral estoppel "protects [litigants] from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979). This rationale can apply also to non-parties who "assume control over litigation in which they

---

**3.** As the jury's finding of fraudulent inducement of the releases may not stand, we need not consider the Banks' contention that the charge to the jury was deficient for failure to instruct that concealment by the Banks would not nullify the release unless the Banks had a duty to disclose.

have a direct financial or proprietary interest." *Id.* at 154, 99 S.Ct. at 974.

Despite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results. As an example, a special concern arises if the first determination was made in circumstances where the losing party had little incentive to litigate the issues fully. This is particularly true where the party against whom estoppel is sought had little warning during the first suit that the issues being decided might become binding against it in later litigation. In such circumstances, courts have been reluctant to allow estoppel. Judge Learned Hand explained these concerns in *The Evergreens v. Nunan,* 141 F.2d 927, 929 (2d Cir.), *cert. denied,* 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944):

> [I]t often works very harshly inexorably to make a fact decided in the first suit conclusively establish even a fact "ultimate" in the second. The stake in the first suit may have been too small to justify great trouble and expense in its prosecution or defense; and the chance that a fact decided in it, even though necessary to its result, may later become important between the parties may have been extremely remote. It is altogether right that the judgment shall forever put an end to the first cause of action; but it is not plain that it is always fair that every fact … decided in it, shall be conclusively established between the parties in all future suits, just because the decision was necessary to the result. What jural relevance facts may acquire in the future it is often impossible even remotely to anticipate…. Defeat in one suit might entail results beyond all calculation by either party; a trivial controversy might bring utter disaster in its train. There is no reason for subjecting the loser to such extravagant hazards….

Recognizing the force of this reasoning, the Supreme Court later stated that it would be unfair to allow offensive collateral estoppel against a party that had little incentive to defend in the first action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979); *accord Pinkney v. Keane,* 920 F.2d 1090, 1096 (2d Cir.1990) ("lack of incentive to litigate vigorously may render the collateral estoppel doctrine inoperative"), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991); *United States v. Berman,* 884 F.2d 916, 924 (6th Cir.1989) ("Unfairness can result when the party to be bound lacked an incentive to litigate in the first trial.") (internal quotation marks omitted); Restatement (Second) of Judgments § 28 (1982) (issue preclusion may not apply where "the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity *or incentive* to obtain a full and fair adjudication in the initial action") (emphasis added).

■ The district court is generally accorded wide discretion to determine when offensive collateral estoppel should be applied. *Parklane,* 439 U.S. at 331, 99 S.Ct. at 651–52. But the discretion has limits; unfair use of a prior determination against a subsequent litigant should not be permitted to stand. We find that the district court exceeded the bounds of its discretion in depriving the Banks of the opportunity to contest the amount of Remington's damages. The fairness concerns raised by Judge Hand and by the *Parklane* ruling are heavily implicated here.

Because BSI was without funds to pay even a modest award, it had very little incentive in the New Jersey damages trial to litigate the amount of Remington's injury. Nor did the Banks, assuming that they exercised control over BSI in the first litigation, have any great incentive to cause BSI to litigate the issue of Remington's damages vigorously. The Banks' interest was limited to the recovery of loans extended to BSI. Once BSI's liability had been found, it was unlikely that the Banks' fortunes would vary significantly depending on the amount of Remington's damages. In any event, it is clear that the Banks did not have an interest in BSI that remotely approached the $220 million figure that Remington sought in damages. *See Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532, 539–41 (2d Cir.1965) (denying application of collateral estoppel on fairness grounds where first

judgment was for $35,000 and second action sought over $7 million), *cert. denied,* 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). BSI thus presented no witnesses and offered only one exhibit. Remington's claims for damages therefore went largely uncontested. The New Jersey district court accordingly accepted Remington's claims for damages virtually as submitted.

The unfairness of permitting estoppel to be enforced against the Banks is exacerbated by the unforeseeability at the time of the BSI damages trial of Remington's future attempt to hold the Banks responsible for the judgment against BSI. *See Parklane,* 439 U.S. at 330, 99 S.Ct. at 651 (foreseeability of future suits is a factor in considering incentive to litigate); Restatement (Second) of Judgments § 28 cmt. i (1982) ("preclusion should not operate ... if it was unforeseeable when the first action was litigated that the issue would arise in the context of the second action, and if that lack of foreseeability may have contributed to the losing party's failure to litigate the issue fully"); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4424 (1981). The Banks had little reason to suspect that Remington's judgment against BSI might later be enforced against the Banks. Remington had not sued the Banks. Nor had it served notice that it would seek in subsequent litigation to hold the Banks responsible for the judgment being sought against BSI. The Banks knew, in addition, that the releases they had received from Remington protected them from liability for conduct before April 23, 1982, at a minimum. In these circumstances, they had virtually no warning that the finding of damages against BSI in the New Jersey suit might be enforced against them.

All the circumstances present here—BSI's insolvent condition at the time of the determination of damages in the first action; the small size of the Banks' interest in the determination of BSI's damages, as compared to the huge size of the award derivatively sought to be imposed on them in this action; and the unforeseeability of this litigation— lead us to conclude that, even if the Banks had full control of BSI in the New Jersey litigation, they lacked incentive to cause BSI to litigate fully the issue of damages.[4] We therefore hold that the district court should not have barred the Banks from contesting Remington's damages.

### Conclusion

We conclude that Remington's release of the Banks in 1982 bars any claim arising from conduct that occurred before the effective dates of the releases. We therefore vacate the judgment and remand for further proceedings. In order to recover, Remington must prove that the Banks incurred liability by conduct subsequent to the time the releases became effective. Remington must also prove its damages; the court may not enforce against the Banks the findings on damages rendered by the jury against BSI in the previous action in New Jersey.

The judgment of the district court is vacated and the case is remanded for further proceedings in accordance with this opinion.

---

**4.** Our rejection of collateral estoppel in this instance is further supported by the highly speculative nature of Remington's unchallenged proffers that were embodied in the first judgment. The findings were based on Remington's unchallenged proofs that: (1) it would have needed 8 years to find an alternate source of supply; (2) Remington would have made profits of $209.67 per machine on sales, parts, and supplies; and (3) Remington's market share and sales would have remained constant from 1982 through 1989, at a level of 100,000 units per year. Given that Remington was unprofitable and in bankruptcy at the time of the sale, BSI might have questioned the level of Remington's assumed profits. Furthermore, Remington's assumption that it would have sold 100,000 typewriters per year from 1982 to 1989 invites rebuttal based on the huge growth in the use of word processing computers in place of typewriters during that period.